EGAN, C. J.
*206 *646 Plaintiff appeals a general judgment dismissing all of his claims against defendants Providence Health & Services-Oregon (Providence), Thomas Hanenburg, Anesthesia Associates of Medford, P.C. (AAM), and AAM anesthesiologists Steven Cannon, Lindy Deatherage, Brian Hall, and Thomas Hammond (defendant anesthesiologists). On appeal, plaintiff raises 13 assignments of error. We reject plaintiff's assignments of error 1, 2, 11, 12, and 13 without discussion. In assignments of error 3 through 10, plaintiff argues that the trial court erred in granting summary judgment to defendants on plaintiff's claims for breach of contract, wrongful discharge, intentional misrepresentation, violations of ORS 659.815, intentional interference with economic relations, and intentional interference with prospective advantage. With respect to those assignments, we conclude that the trial court did not err in granting summary judgment to defendants on all of plaintiff's claims, and we affirm.
I. FACTS
In reviewing a motion for summary judgment, we state the facts in the light most favorable to the nonmoving party, here plaintiff, and draw all reasonable inferences in plaintiff's favor. ORCP 47 C; Harper v. Mt. Hood Community College , 283 Or. App. 207, 208, 388 P.3d 1170 (2016). "[W]here the record could reasonably support either party's version of events, we state the facts as described by plaintiff." Huber v. Dept. of Education , 235 Or. App. 230, 232, 230 P.3d 937 (2010).
Plaintiff's claims pertain to his business relationship with Providence Medical Group-South (PMG), Providence Medford Medical Center (the Providence hospital), and AAM. PMG and the Providence hospital both operate in the Medford area and are owned and operated by Providence. Through PMG, Providence employs physicians who are granted privileges to work at the Providence hospital.[1] AAM
*647 is a medical group operating in the Medford area, which provides anesthesiology services to the Providence hospital.
In late 2009, Providence advertised a cardiovascular surgery position in Medford. Plaintiff, a board-certified cardiothoracic surgeon then employed at Case Western Reserve University, applied for the position and, in February and March 2010, Providence invited plaintiff to visit the Providence hospital for interviews. During those interviews, plaintiff met defendant Hanenburg, the chief executive officer of the Providence hospital; Jackson, the chief executive officer of PMG; several other PMG and Providence hospital personnel; and defendants Hall and Cannon, two of AAM's anesthesiologists. Pertinent to plaintiff's claims are representations that Providence personnel made to plaintiff regarding the cardiovascular surgery position.
*207 Those representations include the following:
• The Providence hospital "had had a [cardiovascular surgery ] program that had been sort of up and down over the last four years. They had a [cardiac] surgeon that had been there, *** consistently for a year and a half, two years *** and that since he had left, [the hospital] had incorporated surgeons [who] would" fill in temporarily.
• There was an established cardiovascular surgery program at the other hospital in Medford, Rogue Valley Medical Center (Rogue Valley). For a number of years, Providence physicians had been referring patients to Rogue Valley for surgeries and were "comfortable" doing so. The AAM anesthesiologists also provided anesthesiology for Rogue Valley's cardiovascular surgeries, but Hall and Cannon "seemed really supportive" of the Providence hospital's program and were planning to provide a core group of six anesthesiologists.
*648 • "Providence wanted to have a competitive program to compete against Rogue Valley Medical Center; to offer all the services for cardiac and general thoracic surgery."
• Providence was hopeful that, if the Providence hospital was able to get another on-call interventionist cardiologist and a cardiothoracic surgeon, the hospital would be able to participate as a receiving facility in the community-wide emergency medical services (EMS) STEMI[2] network, which was a system within the county to rapidly transport STEMI patients to the nearest facility for treatment.
• It was very important to Providence that the cardiovascular surgery program have a sustained record of good outcomes on patient mortality rates.
• Plaintiff's expressed vision of the cardiovascular surgery program consisted of, among other things, the Providence hospital providing "24/7 services for both cardiac surgery and cardiology," a dedicated operating room used solely for cardiothoracic surgeries, and a supportive anesthesia group. From Hanenburg's representations, plaintiff understood that the Providence hospital would provide those conditions.
On behalf of Providence, Hanenburg offered, and plaintiff accepted, the cardiovascular surgery position. PMG's chief executive, Jackson, and plaintiff signed a "Physician Employment Agreement" in March 2010, which provided that plaintiff would receive an annual salary of $416,000, be eligible for additional compensation based on worked "RVUs," and receive potential bonuses for achieving certain "quality metrics," including, among other things, an "observed to expected risk-adjusted ratio of 0.97 or less for" specified surgical procedures, and the hospital becoming a participant as a primary "PCI" center in the EMS STEMI network.
*649 Under the agreement, plaintiff was required to maintain privileges at Providence, abide by Providence's policies and regulations, meet patient care responsibilities, such as charting and phone calls, and meet "productivity and performance standards as established by Providence." The failure to satisfy those requirements could result in "a corrective action plan" or "non-renewal or termination of Physician's Employment Agreement." The employment agreement also included a noncompete provision, under which plaintiff agreed, among other things, that he would not practice cardiac or cardiovascular surgery in Jackson or Josephine counties for a period of 18 months after a termination of employment occurring within the first three-year employment period.
Under the agreement, PMG promised to "provide the facilities, equipment, supplies, inventory, utilities[,] and other services necessary or appropriate to support [plaintiff's] practice of medicine" and to compensate plaintiff according to the terms of the agreement. The contract also provided in section 8.2 that, "[i]n the performance of Physician's medical duties under this Agreement, Physician *208 will exercise his or her independent professional judgment in a manner consistent with currently approved methods and practices of the profession and in the best interests of the patient."
When plaintiff began his employment in June 2010 he learned that the hospital would not be supplying him with the conditions that he considered necessary for a competitive, comprehensive cardiovascular program. There would be no operating room dedicated solely to cardiac surgeries; instead, plaintiff would be performing surgeries in a room in which other surgeries were also performed. Plaintiff also learned that, under AAM's contract with the Providence hospital, the only scheduled times for cardiothoracic anesthesiology services were Tuesdays and Thursdays, from 7:30 a.m. to 12:00 p.m. The anesthesiologists were, however, available on call for 24 hours each day for urgent or emergent cardiac surgeries. In February 2011, the anesthesiologists' scheduled time increased to three days a week, from 7:30 a.m. to 4:00 p.m.
*650 Plaintiff's problems with the anesthesiologists were not limited to the lack of surgery hours. Plaintiff complained to Hanenburg that the anesthesiologists were unsupportive of him. The anesthesiologists argued with plaintiff, and plaintiff interpreted their behavior as wanting to "control, really, my work for their convenience." Plaintiff also complained about the anesthesiologists' practices, including that some of them would not wear masks during a surgery, used bare hands to put in a line, and at least one of the anesthesiologists would make cell phone calls while in the operating room. Plaintiff began expressing his displeasure with these circumstances to Hanenburg early on in his employment.
Plaintiff was not the first surgeon at the Providence hospital to complain to Hanenburg about the anesthesiologists. The Providence hospital's previous cardiovascular surgeon had also complained to Hanenburg that the anesthesiologists were unsupportive of the new cardiovascular surgery program. Other hospital staff at that time also told Hanenburg that the anesthesiologists were not supportive of the program, and a 2007 email from Cannon to the other AAM anesthesiologists confirmed that sentiment, including his wish that "this whole program would simply go away."
Despite the difficult conditions under which plaintiff felt he was working, he performed surgeries not only during the scheduled block times, but also on evenings and weekends. Within the 10 months that plaintiff was employed by Providence, plaintiff performed 161 surgeries, which was higher than the 125 to 150 annual surgeries that plaintiff believes a cardiovascular surgery program needs to thrive. Although plaintiff testified that there were sometimes delays to his surgeries, he also testified that he never had to decline a surgery because of the lack of the availability of the operating room or an anesthesiologist and that the delays did not affect the outcome of his surgeries.
Sometime in September 2010, Hanenburg became concerned about the mortality rates among plaintiff's patients. Hanenburg and plaintiff had a conference call with a few other staff, during which plaintiff agreed to a set of guidelines for surgery scheduling and preoperative consultations with Dr. Swanson at Providence St. Vincent Heart and *651 Vascular Institute in Portland (Providence St. Vincent) on all open heart and cardiovascular cases. Plaintiff believed that the guidelines were a way of relationship building with the anesthesiologists to accommodate their concerns and requests because they "were working fairly hard on the cardiac surgery service, weekends, evenings."
The agreed-to guidelines were formalized into a policy statement, dated September 29, 2010, entitled "CV Surgery Program Development," with which plaintiff also agreed and signed (the September guidelines). The September guidelines required, among other things, the following during the first year of the cardiovascular surgery program: (1) no more than one elective open heart surgery would be scheduled per day; (2) no weekend surgical cases would be scheduled unless the case was an emergent surgical case as defined in the guidelines; (3) plaintiff was to consult with a cardiothoracic surgeon at Providence St. Vincent before performing any elective surgery; (4) plaintiff could not *209 perform an elective surgery without the consensus of the Providence St. Vincent cardiothoracic surgeon, the Providence hospital's cardiothoracic surgeon, and the director of the Providence hospital's heart and vascular program; and (5) in any conflict regarding case selection, support staff availability, or case scheduling, the Providence hospital's administrator on call, in consultation with the appropriate heart and vascular staff, would make the final decision. Plaintiff testified that the September guidelines never prevented him from doing a surgery that he wanted to do.
Not long after the September guidelines took effect, defendant anesthesiologists asked Grant, president of AAM and a member of the Providence hospital's medical executive committee (MEC), to meet them at the Providence hospital on a Sunday to review records of seven cardiac surgeries performed by plaintiff and for which AAM had provided anesthesiology services. Defendant anesthesiologists considered those seven surgeries to have had "bad outcomes." At that meeting, defendant anesthesiologists presented the seven cases to Grant and gave him notes on each of the seven cases. Those notes focused on plaintiff's actions and patient care and highlighted defendant anesthesiologists' concerns *652 about plaintiff with respect to each surgery. Those concerns included questioning whether plaintiff was authorized to perform a procedure and whether certain procedures had been appropriate for the new program, and accusations that plaintiff was dismissing or ignoring anesthesiologists' findings during procedures and was falsifying findings in operative reports.
After the meeting, Grant called Hanenburg and asked for a Monday morning meeting because he had serious concerns regarding plaintiff that he had already shared with Kuhl, who was the president of Medical Staff and chair of the MEC. At that meeting, Grant gave Hanenburg the defendant anesthesiologists' notes, reviewed them with him, and told Hanenburg that the AAM anesthesiologists had significant concerns about plaintiff's care that is "putting the community and our patients at risk." Grant also told Hanenburg that, given the concerns about falsifying information, AAM was evaluating whether it needed to report those concerns to the Oregon Medical Board.
Following that meeting, Hanenburg consulted Sternenberg, the chair of surgery, and Kuhl. They decided that a focused peer review of the seven cases was warranted. Swanson, the surgeon with whom plaintiff was required to consult at Providence St. Vincent, and Kelly, an anesthesiologist at Providence St. Vincent, conducted that review. Swanson and Kelly reported that the "appropriateness of care" in three of the seven cases was unacceptable. Upon receiving that review, the MEC formed a subcommittee to further review the seven cases. Plaintiff agreed to voluntarily refrain from performing surgeries for seven days pending the outcome of the MEC review. At the end of that review, the MEC subcommittee found that one case presented concerns regarding communication and documentation, warranting a letter of admonition to plaintiff.
While the MEC review was being finalized, on October 25, 2010, Hanenburg sent out an interoffice memorandum entitled "Cardiovascular Surgery Case Selection Guidelines" (the October guidelines), which were based on recommendations from Medical Staff. The purpose of the October guidelines was to "take into account the current *653 capability of the facility and the tenure of the heart surgery program." Pertinent to plaintiff's claims, the October guidelines prohibited surgery on any cases "exceeding predetermined morbidity and mortality threshold" for the next 12 months, and, as with the September guidelines, required a preoperative consultation with a member of Providence St. Vincent to ensure proper case selection.
A few days after the October guidelines were sent, Kuhl informed plaintiff that, as a result of the MEC subcommittee review, plaintiff would be receiving a letter of admonition because of concerns "identified around professional judgment, documentation[,] and physician communication," but that it would not result in any adverse action against plaintiff or his privileges at the hospital.
Plaintiff responded to news of the letter of admonition and the September and October guidelines with his own letter to Hanenburg.
*210 Plaintiff stated that those documents constituted a breach by Providence of sections 3.2 and 8.2 of the Physician Employment Agreement with plaintiff. Plaintiff asserted that Providence breached section 3.2 because the letter of admonition related to appropriate case selection based on capabilities and facilities which Providence was required to supply under that section of the contract, and section 8.2 because the guidelines "usurp[ed] [his] independent professional judgment." Plaintiff then demanded that the anesthesiologists change to support his practice of medicine, or that Providence find new anesthesiologists who would.
Following receipt of the letter, Hanenburg met with plaintiff, after which plaintiff turned in his resignation. Hanenburg asked plaintiff whether it was a "firm tender" of resignation, and plaintiff responded that he could stay on if there was improvement. Plaintiff testified that Hanenburg assured him that, if he would follow the September and October guidelines for three months, plaintiff would then be "unshackled," and things would get better.
Plaintiff remained at the Providence hospital, and, on November 22, 2010, he received his official letter of admonition from the MEC, with which the Providence hospital *654 board had concurred. In that letter, plaintiff was admonished to, among other things, adhere to the September and October guidelines, provide adequate and accurate documentation based on the results of a random chart audit during the next three months, and participate in improving communication with the anesthesiologists.
In February 2011, after the three-month chart review, Hanenburg learned that plaintiff had made minimal improvement in charting and had stopped his consultations with Swanson at Providence St. Vincent. Hanenburg sent plaintiff a memo on February 23, which stated that, although plaintiff's use of required forms and documentation had improved, "few, if any, of the required elements for good patient documentation [were] being met." Hanenburg also admonished plaintiff to continue to follow the September and October guidelines, particularly the preoperative consultations. Hanenburg followed the memo with a letter to plaintiff on March 4, 2011, regarding "Office Standards and Professional Practice" that was also signed by Jackson. The March 4 letter stated that plaintiff's documentation was not sufficient, his discharge instructions "[did] not meet the minimal standards specified by regulatory agencies," and he was failing to comply with the guidelines. The letter further provided:
"Our expectation is that you will adhere to the standards as outlined in the Clinical Practice Standards. Improvement of your performance must be immediate and sustained. Your performance in all areas must be consistent and continued, or further corrective action, including discharge, may result."
(Emphasis omitted.)
Three days later, on March 7, 2011, plaintiff emailed Jackson, among others, stating that his previous statement of resignation in November "was clear" and that his last surgery case would be March 15, 2011, but he would continue providing care for his patients recovering from surgery until March 31, 2011. Plaintiff confirmed in his testimony that he resigned in response to the March 4 letter. At an MEC meeting on March 15, plaintiff confirmed his resignation and his last day of work. At the same meeting after plaintiff *655 left, the MEC voted to impose a precautionary suspension of plaintiff's privileges at the hospital "due to concerns regarding patient care and safety, and orderly operation of [the Providence hospital]." Kuhl testified that plaintiff was suspended at that time, with only 15 days left at the hospital, because there were concerns that plaintiff would not follow the guidelines or meet documentation standards, and because of plaintiff's general disinterest in taking suggestions to improve the cardiac program.
On March 17, 2011, plaintiff told Hanenburg that he was exploring employment with the cardiac group at Rogue Valley in the form of covering surgeries for them at Providence, but also acknowledged that he had a noncompete clause in his contract. Plaintiff was notified of the MEC's decision to precautionarily suspend him the next day, on March 18, and on March 28, plaintiff received notice that the Providence hospital's board had affirmed *211 the suspension through March 31. Plaintiff testified that he had heard that the reason for his suspension was to prevent him from being able to obtain privileges at Providence if he wanted to seek recredentialing. In the 10 months that plaintiff worked for Providence, he was compensated a total of $483,569.90.
After his resignation, plaintiff sought employment elsewhere. However, he claimed that his suspension made prospective employers unwilling to interview him and that Providence failed to timely provide records to potential employers and often required "onerous" releases to do so.
Plaintiff filed this action against Providence, Hanenburg, AAM, and defendant anesthesiologists, alleging claims for breach of contract, wrongful discharge, intentional misrepresentation, violation of ORS 659.815, intentional interference with economic relations between plaintiff and Providence (IIER-contract), and intentional interference with prospective economic relations between plaintiff and prospective employers (IIER-prospective advantage). Defendants moved for summary judgment on all claims, and the trial court granted the motions, dismissing all of plaintiff's claims against all defendants and entering judgment accordingly.
*656 Plaintiff appeals the judgment, raising 13 assignments of error. As stated above, we reject plaintiff's assignments of error 1, 2, 11, 12, and 13 without written discussion. Plaintiff's assignments of error 3 through 10 pertain to the trial court's grant of summary judgment to defendants on all of plaintiff's claims. We address those assignments of error as follows and affirm the trial court.
II. ANALYSIS
A party is entitled to summary judgment on a claim when the "record fails to show the existence of a triable issue[.]" Jones v. General Motors Corp. , 325 Or. 404, 413, 939 P.2d 608 (1997) (internal quotation marks omitted). Plaintiff, as the party with the burden of persuasion at trial, had the burden of producing evidence on any issue that defendants raised in their summary judgment motions. ORCP 47 C; Two Two v. Fujitec America, Inc. , 355 Or. 319, 324, 325 P.3d 707 (2014) (explaining the same). Thus, plaintiff had "the burden of producing admissible evidence establishing facts that by themselves or by their reasonable inferences could cause a reasonable juror to find each element of plaintiff['s] claim" that defendants challenged below. Chapman v. Mayfield , 263 Or. App. 528, 530, 329 P.3d 12 (2014), aff'd , 358 Or. 196, 361 P.3d 566 (2015) (internal quotation marks omitted). We review each claim separately to determine whether plaintiff produced evidence establishing that such facts exist for the challenged elements of plaintiff's claims.
A. Third Assignment of Error: Breach of Contract Claim Against Providence
Plaintiff alleged in his third amended complaint that Providence breached its contract in three particulars: (1) by failing to provide plaintiff with the support necessary for a cardiac surgery program; (2) by failing to provide plaintiff with anesthesiologists available for cardiac surgeries, 24 hours a day, seven days a week; and (3) by conducting an unauthorized peer review with the AAM anesthesiologists, and using the information from that review to restrict plaintiff's ability to use his independent judgment on cases. As a result of those breaches, plaintiff alleged that he "was frustrated in his efforts to provide, and prevented from establishing, a competitive comprehensive program."
*657 On summary judgment, Providence argued, among other things, that plaintiff's claim failed because there was no evidence in the summary judgment record raising a genuine issue of material fact that plaintiff suffered damages from the alleged breaches of contract. The trial court agreed, as do we.
"Damage is an essential element of any breach of contract action." Moini v. Hewes , 93 Or. App. 598, 602-03, 763 P.2d 414, rev. den. , 307 Or. 245, 767 P.2d 75 (1988). The uncontroverted facts in the record are that (1) although there were sometimes delays to surgeries, plaintiff never had to decline a case because of a lack of an operating room or other support and the delays did not affect the outcome of the surgeries; (2) there was never a time that plaintiff was unable to *212 obtain requested anesthesia services; and (3) in the 10 months that plaintiff worked for Providence, plaintiff was compensated $483,569.90, which indicates that plaintiff was not only paid the annual guaranteed salary of $416,000, but a significant amount of bonus payments as well.
Plaintiff argues that he produced evidence raising a genuine issue of material fact about his contract damages because he produced evidence that he did not receive the support necessary to have a successful cardiovascular surgery program that Providence promised, which caused him to resign and forgo additional compensation under his contract.[3] However, plaintiff's belief that he did not receive the support necessary for a successful cardiovascular program and his resulting resignation is not, by itself, evidence of damages resulting from the breach of the employment contract, and "we are not bound to agree with plaintiff's advocacy for an interpretation of [the evidence] that [the evidence] will not bear." Doe v. Denny's, Inc. , 327 Or. 354, 360, 963 P.2d 650 (1998). There is no evidence in the summary judgment record from which a juror could directly, or by reasonable inference, find that plaintiff suffered contract *658 damages from the alleged breaches of the employment agreement by Providence. Consequently, the trial court did not err in granting summary judgment to Providence on plaintiff's breach of contract claim.[4]
B. Fifth Assignment of Error: Wrongful Discharge Claim Against Providence
In his claim for wrongful discharge, plaintiff alleged that his resignation was the result of Providence constructively discharging him from his employment. A constructive discharge claim "is simply an alternate means of establishing the element of discharge in a claim for wrongful discharge." Handam v. Wilsonville Holiday Partners, LLC , 225 Or. App. 442, 447, 201 P.3d 920 (2009), vac'd and rem'd , 347 Or. 533, 225 P.3d 43, adh'd to on remand , 235 Or. App. 688, 234 P.3d 133, rev. den. , 349 Or. 171, 243 P.3d 69 (2010). To prove the constructive discharge element, a plaintiff must prove the following things:
"(1) the employer intentionally created or intentionally maintained specified working condition(s); (2) those working conditions were so intolerable that a reasonable person in the employee's position would have resigned because of them; (3) the employer desired to cause the employee to leave employment as a result of those working conditions or knew that the employee was certain, or substantially certain, to leave employment as a result of those working conditions; and (4) the employee did leave the employment as a result of those working conditions."
McGanty v. Staudenraus , 321 Or. 532, 557, 901 P.2d 841 (1995) (emphasis in original; footnote omitted). For the wrongful discharge claim, plaintiff must prove that the discharge occurred as the result of exercising a job-related right that reflects important public policy, or as the result of fulfilling an important public duty. Babick v. Oregon Arena Corp. , 333 Or. 401, 407, 40 P.3d 1059 (2002). Specifically, for constructive discharge, the plaintiff must prove "that the employer's *659 motive for the constructive discharge was the plaintiff's exercise of a job-related right or an important public duty." Hernandez-Nolt v. Washington County , 283 Or. App. 633, 641, 391 P.3d 923, rev. den. , 361 Or. 543, 397 P.3d 32 (2017).
The gravamen of plaintiff's complaint is that Providence constructively discharged him because he complained about the defendant anesthesiologists' violations of standards *213 of care and statutes, and complained that the cardiovascular surgery program was not up to the standards necessary for such a program. Assuming that such complaints could qualify as a job-related right or important public duty, plaintiff has failed to point to any evidence in the summary judgment record that could support a reasonable inference that Providence was motivated by those complaints when it created or maintained the working conditions that plaintiff alleged were intolerable and caused him to resign. Accordingly, we affirm the trial court.[5]
As we understand plaintiff's allegations, plaintiff asserted that Providence caused intolerable working conditions in three ways: (1) Providence failed to provide necessary support, particularly a 24/7 dedicated operating room; (2) Providence failed to address plaintiff's complaints about the anesthesiologists' bad attitude and poor safety practices; and (3) Providence established guidelines-after a "sham" peer review-that limited plaintiff's ability to exercise his independent judgment.
With respect to the first two conditions, as a matter of logic, plaintiff's assertions cannot support his claim. That is so because what plaintiff must be asserting is that, upon beginning employment with Providence, he encountered *660 problems with the defendant anesthesiologists and with the program not being up to the standards promised; he complained about both; and Providence failed to address his complaints, which was intolerable. Thus, to make out a claim for wrongful discharge, plaintiff must be asserting that Providence's failure to address his complaints were intolerable working conditions that Providence was motivated to maintain because plaintiff complained about those very conditions. Even setting aside the circular nature of that argument, plaintiff presented no evidence from which it could reasonably be inferred that his complaints were what motivated Providence to not address his complaints.
With respect to the third condition, plaintiff admitted in his deposition that he resigned in response to the March 4, 2011, letter that informed plaintiff that he had not been meeting certain standards-viz ., that he was not meeting documentation standards and had not adhered to the September and October guidelines-and that he was expected to do so. There is no evidence in the record, however, from which a reasonable juror could infer that Providence's motivation for the letter were plaintiff's complaints about the anesthesiologists and the lack of program support. Rather, the summary judgment record establishes that the letter was prompted by a required three-month chart review of plaintiff and by Hanenburg learning that plaintiff had stopped preoperative consultations with Swanson, as plaintiff had agreed to do.
There is also no evidence in the record from which a reasonable juror could infer that Providence's requirements that plaintiff meet documentation standards or adhere to the agreed-on guidelines were motivated by plaintiff's complaints. Viewed in the light most favorable to plaintiff, the record on summary judgment could support an inference that Providence was not motivated purely out of concern for patient care, but was also motivated to create the guidelines because it desired to have a low-risk cardiac program. The record, however, does not support a reasonable inference that Providence was motivated to create those guidelines because plaintiff had complained about the anesthesiologists and the lack of program support.
*661 Accordingly, the trial court did not err in granting summary judgment to Providence on plaintiff's wrongful discharge claim.
*214 C. Sixth Assignment of Error: Misrepresentation Claim Against Providence and Hanenburg
For plaintiff's claim of intentional misrepresentation, plaintiff alleged that he was induced to accept employment with Providence based on the following alleged misrepresentations by Providence and Hanenburg: (1) Providence hospital had established a comprehensive, quality, competitive cardiovascular surgery program, (2) Providence would provide plaintiff with the opportunity to direct a comprehensive, quality, and competitive program, (3) Providence would provide plaintiff with the support to maintain a successful program, and (4) Providence would provide patients through community referrals and from the EMS STEMI network. He further alleged that, based on the following omissions of Hanenburg: (1) Providence could not provide the necessary support for a successful program, and had been unable to provide the necessary support to maintain a program before hiring plaintiff, and (2) Providence would restrict the patients on which plaintiff could operate based on risk.
In granting summary judgment, the trial court concluded that plaintiff could not produce evidence of a misrepresentation and "there are no damages." We agree with the trial court that the evidence in the summary judgment record does not raise a genuine issue of material fact that plaintiff suffered injury as a result of the alleged misrepresentations.
On appeal, plaintiff contends that he put on evidence that he suffered damages in relation to his breach of contract claim, which are also his damages for his misrepresentation claim. With respect to his breach of contract claim, defendant argued that he was damaged because he did not receive all the compensation under his two-year contract, having resigned after 10 months, and because Providence's suspension of his privileges after he tendered his resignation interfered with plaintiff obtaining other employment. Further, with respect to his misrepresentation *662 claim, plaintiff argues that he "gave up a secure position at Case Western for a position which Providence misrepresented and a program which was destined to fail because of Providence's limitations."
"Damages properly recoverable in an action for intentional misrepresentation are those which are a direct and necessary result of defendant's acts or omissions." Oksenholt v. Lederle Laboratories , 294 Or. 213, 223, 656 P.2d 293 (1982). In the context of a fraudulently induced employment contract, such as here, the Supreme Court has held that a proper measure of damages is the difference between what the plaintiff earned and what the plaintiff would have earned under the promised employment contract. Elizaga v. Kaiser Found. Hospitals , 259 Or. 542, 550, 487 P.2d 870 (1971) ; see also Hocks v. Hocks , 95 Or. App. 40, 46, 767 P.2d 1369, rev. den. , 307 Or. 658, 772 P.2d 1341 (1989) (concluding that trial court did not err in awarding an amount roughly equivalent to what plaintiff would have received under the employment agreement).
With respect to how damages ordinarily are measured for a fraudulently induced employment contract, the only category of damages that fits that measure is plaintiff's claim that he did not receive all of the compensation under his two-year contract. However, viewing the evidence in the light most favorable to plaintiff, the summary judgment record does not support a reasonable inference that plaintiff's failure to complete the two-year contract with Providence was a result of the alleged misrepresentations made to plaintiff 10 months before he resigned. Rather, the only reasonable inference to be drawn from the record is that plaintiff resigned because of circumstances that arose after he accepted employment-e.g. , the focused peer review of his cases and resulting admonition, the implementation of the September and October guidelines, and the March 4, 2011, letter to plaintiff after he failed to adhere to those guidelines and meet documentation standards-and not as a result of representations made to him 10 months earlier when he decided to accept employment with Providence.
In addition, with respect to plaintiff's other claimed categories of damages, plaintiff failed to produce evidence *663 that those damages *215 were a result of the claimed misrepresentations. First, there is no evidence in the summary judgment record indicating that, but for the misrepresentations, plaintiff would have remained at Case Western. Second, although there is evidence that plaintiff believed that the misrepresented conditions were unacceptable, plaintiff produced no evidence that plaintiff suffered a specific injury to his practice of medicine during his employment with Providence as a result of those misrepresented conditions. Finally, with respect to plaintiff's contention that the misrepresentations impaired his future earning capacity, plaintiff does not explain how the alleged misrepresentations made before he accepted employment with Providence were a cause of his suspension of privileges, which was imposed after plaintiff resigned 10 months later.
In sum, plaintiff did not produce evidence from which an objectively reasonable juror could find that plaintiff suffered injuries as a result of defendants' alleged misrepresentations and omissions made before plaintiff accepted employment with Providence. Accordingly, the trial court did not err in granting summary judgment to Providence and Hanenburg on plaintiff's intentional misrepresentation claim.
D. Seventh Assignment of Error: Claim of Fraud Under ORS 659.815 Against Providence
Plaintiff's claim under ORS 659.815 is based on the following provisions in that statute:
"No person, firm, company, corporation, *** employing labor, shall *** induce, influence, persuade or engage workers to change from one place to another in this state or bring workers of any class or calling into this state to work in any of the departments of labor by:
"(1) Any false or deceptive representation or false advertising, concerning the amount or character of the compensation to be paid for any work[.]"
Plaintiff alleged in his complaint that Providence violated that statute "by inducing plaintiff to move to Oregon for employment by misrepresenting the amount or character of compensation and/or labor trouble, in that, [Providence] and *664 Hanenburg made the representations set forth above including, inter alia , that plaintiff could earn a bonus from work supplied by [Providence's] official participation in the EMS STEMI program."
On appeal of the trial court's grant of summary judgment on that claim, plaintiff makes only the bare assertion that the trial court erred because Providence brought plaintiff into this state "with false or deceptive representations by failing to disclose impediments to [plaintiff's] ability to earn bonus compensation in connection with the [EMS] STEMI program."
Assuming, without deciding, that ORS 659.815 applies here, plaintiff does not explain what conditions he asserts Providence failed to disclose when he was hired that impeded his ability to earn bonus compensation in connection with the EMS STEMI program, nor does plaintiff point to any evidence in the summary judgment record in support of the bare assertion he does make. We will not make arguments for plaintiff that plaintiff has not developed for himself, nor will we scour the record in search of evidence that plaintiff has not pointed to that would support a contention that the trial court erred. See, e.g. , Outdoor Media Dimensions Inc. v. State of Oregon , 331 Or. 634, 643 n. 5, 20 P.3d 180 (2001) (stating that where the plaintiff had failed to present argument with respect to a claim, there was nothing for the Court of Appeals to review); Vukanovich v. Kine , 268 Or. App. 623, 634, 342 P.3d 1075, adh'd to as modified on recons , 271 Or. App. 133, 349 P.3d 567 (2015) (rejecting assignment of error to trial court's grant of judgment notwithstanding the verdict where the plaintiff failed to identify evidence in his briefing that would support the jury's verdict). Accordingly, we affirm the trial court's grant of summary judgment to Providence on plaintiff's claim under ORS 659.815.
E. Eighth and Ninth Assignments of Error: IIER-Contract Claims Against AAM, Defendant Anesthesiologists, and Hanenburg
In plaintiff's claim for IIER-contract against AAM, defendant anesthesiologists, *216 and Hanenburg, plaintiff alleged *665 that those defendants intentionally interfered with plaintiff's employment contract with Providence by, in short, refusing to provide the necessary support for the program and causing a peer review of plaintiff's cases "to intimidate plaintiff and cause [Providence] to restrict plaintiff's performance of services."
For plaintiff's IIER-contract claim to survive summary judgment, he had to produce evidence raising genuine issues of material fact for each of the following elements of IIER:
"(1) the existence of a professional or business relationship (which could include, e.g. , a contract or a prospective economic advantage), (2) intentional interference with that relationship, (3) by a third party, (4) accomplished through improper means or for an improper purpose, (5) a causal effect between the interference and damage to the economic relationship, and (6) damages."
McGanty , 321 Or. at 535, 901 P.2d 841. We review the trial court's ruling on the claim as against AAM and defendant anesthesiologists separately from its ruling on the claim as against Hanenburg.
1. IIER-contract claim against AAM and defendant anesthesiologists
With respect to AAM and defendant anesthesiologists, the trial court concluded that plaintiff's IIER-contract claim failed because "there is no admissible evidence that those defendants intentionally interfered [with] plaintiff's relationship with Providence, no issue of material fact whether those defendants acted with improper means or for an improper purpose, and there is no evidence that plaintiff suffered any damages." For the reasons that follow, we conclude that the trial court did not err.
With respect to damages on an IIER claim, a plaintiff must show that, as a result of the interference, "the plaintiff was damaged beyond the fact of the interference." Lund v. Arbonne International, Inc. , 132 Or. App. 87, 95, 887 P.2d 817 (1994). Here, plaintiff's entire argument on appeal is that "[a] jury could infer AAM's [and defendant anesthesiologists'] actions ultimately made it impossible for [plaintiff]
*666 to do the job he'd been hired for," and "[plaintiff] did not receive the compensation called for by his two-year contract, and led to the suspension of his privileges which ultimately impacted securing other employment and impaired his earning capacity." We disagree with plaintiff's assessment of the summary judgment record and conclude that plaintiff has failed to raise a genuine issue of fact that AAM's and defendant anesthesiologists' alleged interference caused plaintiff damages "beyond the fact of the interference."
Although AAM's and defendant anesthesiologists' conduct may have triggered Providence to conduct an independent, focused peer review of some of plaintiff's cases, there is no evidence in the summary judgment record from which a reasonable juror could infer that the outcome of Providence's peer review was influenced by AAM or defendant anesthesiologists. That is, even if AAM's and defendant anesthesiologists' actions with respect to reviewing plaintiff's patient care and triggering Providence's peer review could be improper interference with plaintiff's contract with Providence, plaintiff has not presented any evidence that he suffered any harm as a result, apart from the mere fact that the interference occurred.
In addition, plaintiff did not present any evidence that AAM's or defendant anesthesiologists' conduct interfered with his relationship with Providence by preventing plaintiff from doing his job. As explained elsewhere, the uncontroverted evidence was that plaintiff was never prevented from conducting any surgery that he wanted to conduct, that he was always able to obtain anesthesiology coverage, and that any delays he experienced did not affect the outcomes of his surgeries.
In sum, plaintiff presented no evidence from which a reasonable juror could infer that plaintiff suffered any damages as a result of AAM's or the defendant anesthesiologists' alleged interference with plaintiff's contract with Providence.
2. IIER-contract claims against Hanenburg
We also affirm the trial court's grant of summary judgment on plaintiff's IIER- *217 contract claim as against Hanenburg *667 on the basis that plaintiff failed to produce evidence raising a genuine issue of material fact that Hanenburg interfered by improper means or for an improper purpose.[6]
For an IIER claim, "[d]eliberate interference alone does not give rise to tort liability." Northwest Natural Gas Co. v. Chase Gardens, Inc. , 328 Or. 487, 498, 982 P.2d 1117 (1999). Rather, "such a claim is made out when interference resulting in injury to another is wrongful by some measure beyond the fact of the interference itself. Defendant's liability may arise from improper motives or from the use of improper means." Top Service Body Shop v. Allstate Ins. Co. , 283 Or. 201, 209, 582 P.2d 1365 (1978).
Here, plaintiff alleged that Hanenburg interfered with plaintiff's professional relationship with Providence through both improper means and for an improper purpose. Plaintiff alleged that Hanenburg acted through improper means by
"disparaging plaintiff and the cardiac program, refusing to provide support required, ignoring or failing to timely and professionally respond to plaintiff's reasonable requests for services, resisting, obstructing and impeding plaintiff in the performance of his duties, accessing and reviewing plaintiff's patient records and causing a peer review in order to intimidate plaintiff and cause [the Providence hospital and PMG] to restrict plaintiff's performance of services, and ultimately cause plaintiff to terminate his agreement or be terminated."
Plaintiff further alleged that Hanenburg interfered "for an improper purpose in that, inter alia , defendant Hanenburg attempted to prevent plaintiff from performing the services he agreed to provide *** in furtherance of Hanenburg's interests."
*668 If liability is based on improper means, "then the means must violate some objective, identifiable standard, such as a statute or other regulation, or a recognized rule of common law, or, perhaps, an established standard of a trade or profession." Northwest Natural Gas Co. , 328 Or. at 498, 982 P.2d 1117. "Examples of improper means include 'violence, threats or other intimidation, deceit or misrepresentation, bribery, unfounded litigation, defamation, or disparaging falsehood.' " Grimstad v. Knudsen , 283 Or. App. 28, 57, 386 P.3d 649 (2016), rev. den. , 361 Or. 350, 393 P.3d 1181 (2017) (quoting Top Service Body Shop , 283 Or. at 210 n. 11, 582 P.2d 1365 ). And, if liability is based on an improper motive or purpose, "then the purpose must be to inflict injury on the plaintiff 'as such.' " Northwest Natural Gas Co. , 328 Or. at 498, 982 P.2d 1117 (quoting Top Service Body Shop , 283 Or. at 211, 582 P.2d 1365 ). However, "[g]enerally, a defendant's subjective judgment as to its own business purposes will control." Id. ; see also Top Service Body Shop , 283 Or. at 212, 582 P.2d 1365 (where the defendant's actions were "wholly consistent" with the proper purpose of advancing its business interests, those actions "did not suffice to support an inference of the alleged improper purpose to injure [the plaintiff]"); Eusterman v. Northwest Permanente, P.C. , 204 Or. App. 224, 238, 129 P.3d 213, rev. den. , 341 Or. 579, 146 P.3d 884 (2006) (in a claim by a physician against Kaiser for interfering with the physician's employment contract, it was not an improper purpose for Kaiser to act with the motive of maximizing its profits).
Here, there is no evidence in the summary judgment record that can support a reasonable inference that Hanenburg interfered with plaintiff's professional relationship with Providence through either improper means or with an improper purpose. There is no evidence that Hanenburg acted through improper means by violating some identifiable *218 standard or using violence, threats, or disparagement of plaintiff. Hanenburg's conduct was consistent with his professed proper purposes of acting with respect to plaintiff's relationship with Providence with the motives of providing quality patient care and building the reputation of Providence's cardiac program, and plaintiff has not supplied any evidence from which a jury reasonably could infer a different, improper purpose. *669 We therefore conclude that the trial court did not err in granting summary judgment on plaintiff's IIER-contract claim against AAM, defendant anesthesiologists, and Hanenburg.
F. Tenth Assignment of Error: IIER-Prospective Advantage Claims Against AAM, Defendant Anesthesiologists, Providence, and Hanenburg
Finally, plaintiff assigns error to the trial court's grant of summary judgment on his claim for intentional interference with plaintiff's prospective economic relations. To prevail on that claim, plaintiff must prove the same elements set out above for his IIER-contract claim. Allen v. Hall , 328 Or. 276, 281, 974 P.2d 199 (1999).
Plaintiff alleged in his claim that AAM, defendant anesthesiologists, Providence, and Hanenburg "interfered with plaintiff's prospective advantage with prospective employers for an improper purpose and/or through improper means" as alleged in plaintiff's IIER-contract claim. Plaintiff did not include any allegations identifying the "prospective employers" or the means by which he alleged that defendants interfered in those prospective relationships, except to state that "plaintiff's damages have continued because [Providence] improperly, falsely and maliciously failed to provide potential employers of plaintiff with prompt and accurate records and reports of service." In response to defendants' motions for summary judgment, plaintiff also did not specifically identify any prospective relationship with which he alleged defendants had interfered, or the means by which he alleged the interference occurred.
On that claim, the trial court concluded that defendants were entitled to summary judgment because there was no evidence that defendants did anything to interfere with plaintiff's potential future employment with the cardiac group that worked with Rogue Valley, and that plaintiff did not incur any damages because the noncompetition clause in his contract prevented him from working for that competitor.
On appeal, plaintiff argues that, by preventing him from creating a successful cardiovascular surgery program *670 and by suspending him, Providence interfered with plaintiff's future employment. Plaintiff also argues that his claim was not specific to Rogue Valley, but is a claim of interference with many prospective employers, including those outside the purview of the noncompete clause in his contract with Providence. We reject plaintiff's arguments on appeal.
First, we note that plaintiff makes no arguments regarding the trial court's grant of summary judgment as against AAM and defendant anesthesiologists. Second, with respect to Providence and Hanenburg, plaintiff also makes no argument on appeal in response to the trial court's conclusion that he produced no admissible evidence that defendants did anything to interfere with plaintiff's potential future employment with Rogue Valley. Because we will not endeavor to make arguments for plaintiff that he has not made for himself, we do not further address those aspects of his IIER-prospective advantage claim. See, e.g. , Outdoor Media Dimensions Inc. , 331 Or. at 643 n. 5, 20 P.3d 180 ; Vukanovich , 268 Or. App. at 634, 342 P.3d 1075.
Finally, with respect to the argument plaintiff does make on appeal-that Providence's suspension of him interfered with his ability to obtain prospective employment generally-plaintiff has presented no evidence of the existence of any specific prospective business relationship with which Providence allegedly interfered. The first element of an IIER claim requires proof of the existence of a professional or business relationship. In the context of a business relationship that is based on prospective economic advantage, that element still requires a plaintiff to put on evidence of, at a minimum, the identity of the other party to the alleged *219 prospective relationship with which the plaintiff alleges the defendant interfered. See, e.g. , Cron v. Zimmer , 255 Or. App. 114, 127, 296 P.3d 567 (2013) ("In summary, to satisfy the existence of an economic relationship element, a plaintiff must establish a voluntary relationship with another party that would have very likely resulted in a pecuniary benefit for the plaintiff but for the defendant's interference." (Emphasis in original.)); Thompson v. Telephone & Data Systems, Inc. , 130 Or. App. 302, 313 n. 1, 881 P.2d 819, adh'd to as modified on recons , 132 Or. App. 103, 888 P.2d 16 (1994) (liability for intentional interference with prospective *671 business advantage "arises when the defendant, without a privilege to do so, induces a third person not to enter into or to continue a business relationship with the plaintiff"). Plaintiff has failed to do that. Accordingly, we affirm the trial court's grant of summary judgment on plaintiff's IIER-prospective advantage claim.
Affirmed.

The third amended complaint and the summary judgment record do not provide a clear picture of the relationship between Providence, PMG, and the Providence hospital. Although the caption of plaintiff's third amended complaint lists "[Providence,] dba [PMG,]" as the defendant, plaintiff refers to Providence and PMG as separate entities in his complaint. As to those two entities, plaintiff only asserts claims against Providence, which plaintiff alleges arise from PMG's and the Providence hospital's actions. The summary judgment record indicates that PMG and the Providence hospital are owned and operated "under the auspices of [Providence]." For purposes of this opinion, we refer to Providence as the defendant in this action, and refer to PMG and the Providence hospital only as an aid in understanding plaintiff's relationship with those two entities.

We understand STEMI to stand for ST-Elevation Myocardial Infarction, which is a serious type of heart attack.

Plaintiff also argues that, because Providence suspended his privileges, his career came to a "standstill" and he incurred damages in the form of impairment to his future earning capacity. Assuming that plaintiff raises a proper measure of contract damages based on the alleged contractual breaches by Providence, there is no evidence in the summary judgment record that plaintiff actually suffered any such damages. Thus, we also reject that argument.

In his fourth assignment of error, plaintiff also asserts that the trial court erred in concluding that he failed to exhaust his administrative remedies with regard to his suspension and that, therefore, plaintiff was precluded from raising such issues in his breach of contract claim. Because we affirm the trial court on the basis that plaintiff failed to raise a genuine issue of fact with regard to his contract damages, we do not address plaintiff's fourth assignment of error.

Plaintiff asserts that Providence did not raise that issue below. However, Providence did raise it in its motion for summary judgment and pointed out in its reply on summary judgment that plaintiff had failed to point to evidence pertaining to that issue. Although the trial court's grant of summary judgment on the wrongful discharge claim was based on plaintiff failing to establish an issue of fact that he was constructively discharged, and not on the element of Providence's motivation, we may affirm a trial court's ruling on a basis that was argued by the parties below but that was not relied upon by the trial court. Clemente v. State of Oregon , 227 Or. App. 434, 440, 206 P.3d 249 (2009). In this case, we conclude that we should affirm on the alternative basis. See Outdoor Media Dimensions Inc. v. State of Oregon , 331 Or. 634, 659-60, 20 P.3d 180 (2001) (setting out conditions for affirming on a "right for the wrong reason" basis).

The trial court granted summary judgment on plaintiff's IIER-contract claim against Hanenburg because the court concluded that plaintiff had failed to produce evidence raising a genuine issue of material fact that Hanenburg was a third party to the contract. However, in this case, both plaintiff and Hanenburg also raised the issue on summary judgment whether Hanenburg's actions occurred by an improper means or for an improper purpose. See Outdoor Media Dimensions Inc. , 331 Or. at 659-60, 20 P.3d 180 (setting out conditions for affirming on a "right for the wrong reason" basis). We, therefore, affirm on those grounds and express no opinion about the evidence pertaining to Hanenburg's status as a third party.