Argued and submitted January 7, 1998, decision of Court of Appeals reversed and
case remanded to Court of Appeals May 20, 1999

NORTHWEST NATURAL GAS COMPANY,
an Oregon corporation,
*Petitioner on Review,*

*v.*

CHASE GARDENS, INC.,
*Respondent on Review,*

*and*

KEY BANK OF OREGON,
an Oregon state banking corporation;
Willamette Production Credit Association,
an Oregon business;
Centennial Bank,
an Oregon state banking corporation;
Orix Credit Alliance, Inc.,
an Oregon corporation;
Turco Engineering, Inc.,
an Oregon corporation;
Benno Dobbe,
dba Holland America Bulb Farms,
a Washington corporation;
Westar Marketing Company,
dba Oregon Natural Gas Development Corporation,
an Oregon corporation;
and State Accident Insurance Fund,
an Oregon corporation,
*Defendants.*

(CC 16-91-01370; CA A90481; SC S44281)

982 P2d 1117

488

John R. Faust, Jr., of Schwabe, Williamson & Wyatt, Portland, argued the cause and filed the briefs for petitioner on review.

Joel DeVore, of Luvass, Cobb, Richards & Fraser, PC, Eugene, argued the cause for respondent on review. With him on the briefs were Joe B. Richards and Robert H. Fraser, Eugene.

Gina Anne Johnnie and Kenneth Sherman, Jr., of Sherman, Sherman & Murch, Salem, filed a brief on behalf of *amicus curiae* Oregon Bankers Association.

Wendell G. Kusnerus, Portland, filed a brief on behalf of *amicus curiae* United States National Bank of Oregon.

David F. Rees, of Stoll Stoll Berne Lokting & Shlachter P.C., Portland, filed a brief on behalf of *amicus curiae* Oregon Trial Lawyers Association.

Before Carson, Chief Justice, and Gillette, Van Hoomissen, and Kulongoski, Justices.**

VAN HOOMISSEN, J.

---

** Fadeley, J., retired January 31, 1998, and did not participate in this decision; Graber, J., resigned March 31, 1998, and did not participate in this decision; Durham, J., did not participate in the decision of this case.

## VAN HOOMISSEN, J.

Plaintiff Northwest Natural Gas Company (NWNG) filed this action for breach of contract and open account against defendant Chase Gardens, Inc. (Chase) and others, seeking to collect money that Chase owed for natural gas and natural gas transportation services, and to foreclose agricultural service liens that NWNG had placed on Chase's crop to secure those amounts. Chase counterclaimed to recover from NWNG for breach of contract and for intentional interference with Chase's relationship with the Centennial Bank (the bank), Chase's lender.

The trial court denied NWNG's motions for directed verdicts on each count of Chase's counterclaim. Thereafter, a jury found that Chase owed NWNG $182,069.09. The jury further found that NWNG was liable to Chase for $1,900,000 for breach of contract, and for $2,151,226 in economic damages and $3,000,000 in punitive damages for intentional interference with Chase's relationship with the bank. The trial court entered judgment for NWNG on its contract claim and for Chase on its intentional interference claim. The trial court did not enter a money judgment on Chase's breach of contract counterclaim, because the damages duplicated those on the tort claim. NWNG appealed, and Chase cross-appealed. The Court of Appeals affirmed. *Northwest Natural Gas Co. v. Chase Gardens, Inc.*, 146 Or App 249, 933 P2d 370, *adhered to as modified* 147 Or App 586, 938 P2d 778 (1997). We allowed NWNG's petition for review.

The dispositive issue is whether the evidence at trial permitted the jury to find that NWNG intentionally interfered with Chase's business relationship with the bank. For the reasons that follow, we reverse the decision of the Court of Appeals and remand this case to that court for consideration of the issues presented on appeal relating to Chase's breach of contract claim.

■ We view the evidence, and the reasonable inferences to be drawn therefrom, in the light most favorable to the party in whose favor the verdict was returned and consider whether there was any evidence to support the jury's verdict.

Or Const, Art VII (Amended), § 3; *Tadsen v. Praegitzer Industries, Inc.*, 324 Or 465, 468, 928 P2d 980 (1996); *Whinston v. Kaiser Foundation Hospital*, 309 Or 350, 356 n 8, 788 P2d 428 (1990).

We take the following relevant facts from the Court of Appeals' opinion:

"Chase owned * * * 20 acres of heated green houses in which it grew flowers. * * * In the mid-1980's Chase's primary source of heat for the greenhouses was steam that it purchased from the Eugene Water and Electricity Board (EWEB). It also had back-up boilers in which it could burn various fuels to produce steam at the site.

"During the mid and late 1980's, Chase experienced financial difficulties, * *.* and had significant losses in several of those years. * * *

"* * * In late September 1988, Chase signed a contract to receive natural gas service from NWNG. * * * Chase chose interruptible gas service, because the costs were lower than with firm service. * * *

"* * * * *

"By January 1989, Chase had fallen behind in its payments to NWNG. * * * Beginning in August 1989, Chase and NWNG agreed on several plans for bringing its account current, but Chase was never able to eliminate the entire debt.[1] At the end of November 1990 Chase made, and NWNG accepted, a late payment that was sufficient to cover the current billing but that failed to include the agreed payment on the arrearages. * * *

"* * * NWNG's bill for Chase's November usage was $44,605.17, which brought the total amount owed to $52,563.04. * * * In mid-December, Chase attempted to get NWNG to agree to modify the repayment schedule and to allow Chase to defer part of the December and January bills in anticipation of the [1991] Valentine's Day harvest. NWNG's credit manager, who had not been involved in the

---

[1] In June 1990, NWNG agreed to allow Chase additional time to pay its arrears, which at that time were $20,911.25. Chase agreed to pay all future monthly billings when due and to pay monthly installments of $2,614 on its arrears.

discussions before Chase signed the contract, refused. Chase made no more payments to NWNG.

"During December 1990, the Eugene area experienced the longest, broadest spectrum cold spell in its history. The increased demand for gas led NWNG to notify Chase to discontinue taking gas so that it could meet the demands of its firm customers. * * * Chase, however, was unable to get its fuel oil system to work properly for several days. It therefore used a large amount of gas at high penalty rates. As a result of the cold and of the penalty rates, Chase's bill for December, which NWNG prepared in early January, was for an additional $96,331.92.

"Chase's failure to make the agreed arrearage payment in November was a result of renewed cash flow problems. In an effort to overcome those problems, it decided not to emphasize Christmas sales in 1990 but to focus on its primary sales periods of Valentine's Day, Easter, and Mother's Day in 1991. * * * For cash flow until Valentine's Day it could rely on its regular bank line of credit against its receivables and on a special 'bulge' line of $100,000 that was available on February 1 for harvesting the Valentine's Day crop. Chase anticipated that sales from that crop both would finance the remaining holidays' crops and, together with those crops, would provide money to pay its creditors, including NWNG. Its problem was getting to Valentine's Day.

"On December 27[, 1990], NWNG's credit manager wrote Chase that its bill was 'past due in the amount of $49,832.17,' a figure that included the billing for November, which was due on December 26, and the November and December payments on the arrearages. He threatened to terminate gas service unless Chase paid that amount by January 4, 1991. Before he wrote this letter, NWNG had also decided to file a lien for the past due amount; it did so on December 31. * * *

"Before NWNG filed the lien, its credit manager had learned that the bank was Chase's lender. * * * He also knew that it was reasonably foreseeable that the lien would lead the bank to stop Chase's line of credit and would thus dry up its cash flow; he was willing to take that risk. * * *

"[Early in January 1991], Chase met with the credit manager and an NWNG attorney. Chase proposed to give NWNG priority over most other unsecured creditors and to

give it a second mortgage on a house that would secure most of the amount claimed in the lien. * * *

"* * * * *

"NWNG management did not agree to immediate termination of gas service. Instead, on January 9 the credit manager sent Chase a letter that gave it two options:

" '1) Pay Northwest Natural Gas company $100,000. If you choose this option, the Agricultural Services Lien filed on December 31, 1990, for $49,832.17, would be terminated.

" '2) Pay Northwest Natural Gas Company $60,000. If you choose this option, the Agricultural Services Lien filed on December 31, 1990, for $49,832.17, would remain in force.'

"According to the letter, if Chase did not comply with either option by January 15, NWNG would terminate gas service on January 16. If Chase did comply, NWNG would require it to pay all future bills within normal terms and to make and maintain payment arrangements on the arrears.[2]

"The bank received formal notice of the lien on January 9, 1991. The next day it cut off Chase's line of credit, *solely because of the lien*; as of December 1990 it still believed that Chase would be successful. Without money from the bank, Chase was unable to meet either of the conditions in NWNG's letter. It stopped taking gas on January 10; on January 11 it shut down its oil burners rather than take

[2] NWNG asserts that its letter was a "work-out" proposal intended solely to state the conditions under which it was willing to continue providing gas to Chase. It argues that, had Chase merely wanted NWNG to remove the lien, Chase could have forced NWNG to do so by paying the amount claimed in the lien.

ORS 87.346 provides, in part:

"(1) When a person claiming a lien under ORS 87.216 to 87.232 receives full payment of the claim * * * the person shall file with the Secretary of State or the recording officer of the county in which the claim of lien is recorded a certificate declaring that full payment has been received from the lien debtor and that the claim of lien is discharged.

"* * * * *

"(3) If any lien claimant, after full payment of the claim, within 10 days after being requested thereto, fails to discharge the claim of lien, the person is liable to the owner of the chattel formerly subject to the lien in the sum of $100 damages and for all actual damages caused by the failure of the lien claimant to discharge the claim of lien. The owner of the chattel shall recover those damages by an action at law."

delivery of oil for which it could not pay. It immediately laid off most of its employees and used what money it had available to pay their wages. *Chase closed its business because the lien resulted in the bank's withdrawing its line of credit, not because NWNG threatened to terminate gas service."* *Northwest Natural Gas*, 146 Or App at 252-257 (emphasis added; footnotes omitted).

NWNG terminated Chase's gas service on January 22, 1991.[3]

At trial, at the close of all the evidence, NWNG moved for directed verdicts on Chase's counterclaims, arguing, in part:

"Turning to Chase Gardens' Counterclaim for intentional interference with business relationship with Centennial Bank, there is no evidence of any intentional interference. The intentionality requirement is quite strict and quite high under * * * *Straube v. Larson*[, 287 Or 357, 600 P2d 371 (1979)]. There simply is no evidence at all to support that Northwest Natural intentionally interfered with Chase Gardens' relationship with Centennial Bank.

"In addition, another element of that [tort] is that there must be interference committed by either wrongful means or wrongful purpose. There is evidence of neither. There is no evidence of wrongful means. The lien was valid. There is no evidence of wrongful purpose or wrongful motive.

"* * * * *

"Finally, against both their claims for * * * intentional interference and breach of contract; that is, Chase's counterclaims, there is no evidence of causation. Northwest Natural Gas's filing of the lien did not cause Chase's damage. In addition, the letter that we sent on January 9th, 1991 did not cause their damage. Chase Gardens turned off its own gas on January 10, 1991. In addition, [Defendant] Westar [Marketing Company] filed its own independent lien on January 11th, 1991, which would have caused the same situation for Chase Gardens that they claim was caused by the filing of a lien by Northwest Natural Gas. Therefore, Northwest Natural Gas did not cause this situation."

---

[3] Chase's gas usage in January 1991 resulted in a bill for an additional $33,174.13. The total amount Chase owed NWNG was $182,069.09, which is the amount of the jury's verdict and resulting judgment on NWNG's claim.

The trial court denied NWNG's motions without comment.

On appeal, NWNG assigned as error, *inter alia*, the trial court's denial of its motions for directed verdicts on Chase's counterclaims, asserting that there was no evidence to support it. Relevant to Chase's tort claim, NWNG argued that: (1) there was no evidence that NWNG had acted with an improper motive in filing the lien, (2) there was no evidence that NWNG had used improper means, and (3) there was no evidence that its letter caused Chase's loss of bank credit and resulting monetary damages, *because* (a) there was no evidence that the bank took any action as a result of the letter, (b) there was no evidence that Chase had the financial ability to pay the lien, and (c) as a matter of law, its letter could not have prevented Chase from tendering payment of the amount claimed in the lien, which, under ORS 87.346, would have required NWNG to discharge the lien. Chase responded, in part, that NWNG had not preserved its causation arguments at trial.

The decisive issue on appeal was whether the evidence permitted the jury to find that NWNG intentionally interfered with Chase's relationship with the bank. The Court of Appeals first considered the issue of improper motive *in filing the lien*.[4] The court held that the filing was a legitimate exercise of NWNG's statutory and contractual right to attempt to collect the debt Chase owed NWNG and that the filing alone could not create tort liability:

> "To the extent that Chase's counterclaim is based on NWNG's attempt to improve its position by filing the lien, it fails. There is nothing inherently improper about one creditor seeking to push itself ahead of other creditors. In order to establish an improper purpose, thus, Chase must prove its additional allegation that NWNG sought to gain a more favorable position *than the law or the agreement of the parties permitted*. Because the contract, by operation of law, permitted NWNG to file the lien, its purpose in doing so cannot be improper and that claim also fails." 146 Or App at 259 (emphasis in original).

---

[4] Filing the lien notice did not create the lien, which arose by operation of law as NWNG delivered gas to Chase. ORS 87.226. The filing only preserved the lien. ORS 87.256.

Chase does not challenge that holding on review.

The Court of Appeals next considered whether NWNG used improper means or whether it had an improper purpose for its conduct *other than filing and enforcing the lien*. The court concluded:

> "The jury could find that, although the lien was valid, NWNG attempted to use it improperly to gain advantages to which it was not entitled and that it intended to cause Chase to go out of business if its improper conditions were not met. The crucial event in this regard was the January 9 letter, in which, the jury could find, NWNG gave Chase the choice of paying $100,000 in order to have the lien removed or paying $60,000 and leaving the lien in place." 146 Or App at 261.

The court further concluded:

> "[The jury] could find that the letter also involved the terms on which NWNG would release the lien. * * * The jury could find that it is reasonable to read the letter as describing *both* the conditions for continuing service *and* the conditions for removing the lien. * * * The jury could find that the letter indicated that NWNG would not remove the lien even if Chase paid the amount of the lien. The letter was thus an improper means.
>
> "* * * * *
>
> "The jury could also find that NWNG wanted to end its contractual relationship with a difficult customer and that it was willing to put Chase out of business to achieve that goal. * * * The jury could find, * * * that [NWNG's] actions made no business sense if NWNG's purpose was to collect what Chase owed. If that had been its purpose, it would have made it possible for Chase to get through its upcoming harvests, thus producing cash flow that would at least have reduced Chase's debt to NWNG.
>
> "The jury could find that, instead, NWNG decided to shut Chase down in order to get out of any continuing obligations under the contract and that it used the January 9 letter to achieve that purpose." 146 Or App at 261-62.

The Court of Appeals summarized its tort analysis as follows:

> "Filing the lien by itself was a legitimate attempt to collect the debt that Chase owed NWNG. Using the lien as a

basis for making excessive demands, with the intent of putting Chase out of business by interfering with its relationship with the source of its operating capital, not in order to collect the debt but in order to get out of an existing relationship, was not. The jury could thus have found that the January 9 letter was an improper means and that the goal of putting Chase out of business in order to avoid having to continue an existing relationship was an improper purpose." 146 Or App at 262.

The Court of Appeals refused to consider NWNG's arguments on appeal that its actions did not cause Chase's damages, concluding that NWNG had failed to preserve those arguments at trial. 146 Or App at 262 n 10; *on recons* 147 Or App at 589-90. Because the Court of Appeals held that the evidence at trial permitted the jury to find that NWNG committed the tort of intentional interference with Chase's business relationship with the bank, it did not consider the issues on appeal related to Chase's breach of contract claim.

On review, NWNG contends that the Court of Appeals erred in affirming the trial court judgment. Addressing Chase's intentional interference claim, NWNG argues: (1) there was no evidence that it used any means that violated an identifiable, objective standard of conduct; (2) there was no evidence that it had an improper purpose to harm Chase, but only evidence that it was trying to advance its own business interests as it saw them in collecting the money Chase owed; and (3) the Court of Appeals erred in concluding that NWNG had not preserved the arguments that it made on appeal as to why its actions did not cause Chase's damage. Chase responds in part that the Court of Appeals correctly ruled that NWNG had not preserved its causation arguments on appeal.

▪ To state a claim for intentional interference with economic relations, a plaintiff must allege: (1) the existence of a professional or business relationship; (2) intentional interference with that relationship; (3) by a third party; (4) accomplished through improper means or for an improper purpose; (5) a causal effect between the interference and damage to the economic relations; and (6) damages. *McGanty v. Staudenraus*, 321 Or 532, 535, 901 P2d 841 (1995); *Uptown*

*Heights Associates v. Seafirst Corp.*, 320 Or 638, 651, 891 P2d 639 (1995).

■■ Deliberate interference alone does not give rise to tort liability. In *Top Service Body Shop v. Allstate Ins. Co.*, 283 Or 201, 209-10, 582 P2d 1365 (1973), this court stated:

> "[A] claim [of tort liability for intentional interference with a contractual or other economic relations] is made out when interference resulting in injury to another is wrongful by some measure beyond the fact of the interference itself. Defendant's liability may arise from improper motives or from the use of improper means. They may be wrongful by reason of a statute or other regulation, or a recognized rule of common law, or perhaps an established standard of a trade or profession." (Footnote omitted.)

To be entitled to reach a jury, a plaintiff must not only prove

> "that defendant intentionally interfered with his business relationship but also that defendant had a duty of non-interference; *i.e.*, that he interfered for an improper purpose rather than for a legitimate one, or that defendant used improper means which resulted in injury to plaintiff. Therefore, a case is made out which entitles plaintiff to go to a jury only 'when interference resulting in injury to another is wrongful by some measure beyond the fact of the interference itself.' " *Straube*, 287 Or at 361 (quoting *Top Service*, 283 Or at 209).

■■ Thus, if liability in tort is to be based on an actor's purpose, then the purpose must be to inflict injury on the plaintiff "as such." *Top Service*, 283 Or at 211. And, if liability in tort is based on an actor's means, then the means must violate some objective, identifiable standard, such as a statute or other regulation, or a recognized rule of common law, or, perhaps, an established standard of a trade or profession. *Id.* at 209-10. Generally, a defendant's subjective judgment as to its own business purposes will control. *Top Service*, 283 Or at 212. *See also Wampler v. Palmerton*, 250 Or 65, 74, 439 P2d 601 (1968) (a person "promoting an interest which is equal or superior in social value to that with which he interferes" may be privileged or justified).

■     The burden of proof rests with a plaintiff to show both that a defendant intentionally interfered with the plaintiff's economic relationship and that the defendant had no privilege to do so. *North Pacific Lbr. Co. v. Moore*, 275 Or 359, 369, 551 P2d 431 (1976).

■     In considering Chase's tort claim, the Court of Appeals focused on the element of improper means or improper purpose, refusing to consider NWNG's specific alternative causation arguments on appeal because, in that court's view, they were not preserved at trial. We, however, first address the question whether NWNG preserved those specific alternative arguments for appeal by raising the *issue* of causation at trial.

As noted, NWNG's trial counsel argued at trial:

> "Finally, against both their claims for * * * intentional interference and breach of contract; that is, Chase's counterclaims, there is no evidence of causation. * * * In addition, the letter that we sent on January 9th, 1991 did not cause their damage. * * * Therefore, Northwest Natural Gas did not cause this situation."

In *State v. Hitz*, 307 Or 183, 188, 766 P2d 363 (1988) this court stated:

> "We have previously drawn attention to the distinctions between raising an *issue* at trial, identifying a *source* for a claimed position, and making a particular *argument*. * * * The first ordinarily is essential, the second less so, the third least." (Emphasis in original; citation omitted.)

*See also Cooper v. Eugene Sch. Dist. No. 4J*, 301 Or 358, 370 n 12, 723 P2d 298 (1986) (a court is not confined to choosing only among the arguments and authorities cited by counsel for or against a properly identified claim). NWNG argues that, by arguing at trial that the letter did not cause Chase's damages, it raised the issue of causation, thereby preserving the specific alternative arguments that it made on appeal.

■     NWNG preserved the *issue* of causation at trial. The question then is whether NWNG also preserved the specific alternative arguments about causation that it asserted for the first time on appeal. In answering that question, we view the record in light of the purposes of fairness and efficiency

that underlie the preservation requirement. *See State v. Stevens*, 328 Or 116, 122, 970 P2d 215 (1998) (in considering whether an objection at trial raised the issue being advanced on appeal, an appellate court must view the facts in light of the purposes of fairness and efficiency that underlie the requirement). In *Davis v. O'Brien*, 320 Or 729, 737, 891 P2d 1307 (1995), this court stated:

> "[T]he rules pertaining to preservation of error in trial courts are intended to advance goals such as ensuring that the positions of the parties are presented clearly to the initial tribunal and that parties are not taken by surprise, mislead, or denied opportunities to meet an argument."

*See also Shields v. Campbell*, 277 Or 71, 77-78, 559 P2d 1275 (1977) (reason for the rule requiring timely objection "is not merely to promote form over substance but to promote an efficient administration of justice and the saving of judicial time").

*Stull v. Hoke*, 326 Or 72, 948 P2d 722 (1997), rejected the contention that a plaintiff's argument was unpreserved, and stated:

> "We find that the issue was preserved sufficiently under the standards set out in [*Hitz*], because *plaintiff raised and preserved the broader legal issue* [in the Court of Appeals]— whether the trial court erred in holding that his claims were barred by the statute of limitations. Under the rationale in *Hitz*, a specific alternative argument regarding that issue can be raised for the first time in this court." *Id.* at 77 (emphasis added).

*See also State v. Bennett*, 301 Or 299, 308, 721 P2d 1375 (1986) (the issue whether the search violated the state constitution having been raised, the fact that the state argued on appeal that the search was justified as "incidental to arrest" rather than as a "mobile automobile exception" was irrelevant, and the state and defendant were entitled to argue any justification or lack of it for the search) (Jones, J., concurring); *Columbia Boat Sales v. Island Packet Yachts*, 105 Or App 85, 87, 803 P2d 283 (1990) ("Plaintiff raised the issue of personal jurisdiction below and that is enough.").

The record shows that NWNG's counsel argued at trial that NWNG's conduct did not cause Chase's damage. On

this record, we conclude that permitting NWNG to make specific alternative arguments on appeal on the issue of causation results in no fundamental unfairness to Chase, which makes no showing that it was taken by surprise, misled, or denied any opportunity to meet NWNG's specific alternative arguments at trial or on appeal. Chase does not explain how it might have presented its case any differently at trial had NWNG's counsel followed up his assertion that NWNG did not cause Chase's damages with the specific alternative arguments that NWNG made on appeal.

■ Generally, on appeal, the case should be heard on the same theory on which it was presented in the court below. *State v. Hickman*, 273 Or 358, 360, 540 P2d 1406 (1975). Here, NWNG moved for a directed verdict on Chase's counterclaim on the ground that there was no evidence that NWNG caused Chase's damage. After reviewing the record, we conclude that the Court of Appeals raised the preservation bar too high and that the purposes of the preservation rule will not be frustrated by allowing NWNG to present its specific alternative arguments on appeal. We hold that the Court of Appeals erred in refusing to consider the specific alternative arguments regarding the element of causation relied on by NWNG on appeal. We proceed to consider the merits of NWNG's arguments concerning the issue of causation.

■ Based on our review of the record, we conclude that there was no evidence presented at trial that NWNG's conduct caused Chase's damage. And, because causation is an element of the tort, it follows that there is no evidence to support the tort verdict against NWNG. As the Court of Appeals concluded, Chase closed its business because the lien resulted in the bank withdrawing its line of credit, not because NWNG threatened to terminate gas service. *See* 146 Or App at 257 ("Without money from the bank, Chase was unable to meet either of the conditions in NWNG's letter.").

At trial, the bank's manager testified that the bank's *sole* reason for terminating Chase's line of credit was NWNG's lien. Bruce Chase testified that NWNG's lien "killed our bank credit and our cash flow," thus forcing his decision to shut the business down. The record also shows that the

negotiations between NWNG and Chase in January 1991 never were about payment of the amount due under the lien. Rather, the negotiations always were about whether NWNG would remove its lien on terms that Chase could satisfy. For example, Chase proposed to give NWNG priority over most of its other unsecured creditors and to give NWNG a second mortgage on real property that Chase claims would have secured most of the amount that NWNG claimed in its lien. NWNG declined to accept Chase's proposal. Chase points to no evidence that NWNG ever was under a duty under penalty of tort liability to remove its lien on terms that Chase could satisfy. Even assuming that there might have been a contractual duty to do so, a question we specifically do not address here, no duty to do so under tort is apparent.

After NWNG filed its lien, it sent Chase a letter explaining the conditions under which it was willing to continue providing gas to Chase. Assuming, *arguendo*, that NWNG's letter could be found to be improper, the fact remains that it did not cause the interference between Chase and the bank; therefore, the letter could not provide a basis for finding tort liability. Chase appears to argue that it should prevail, because there is evidence in the record that NWNG knew that its actions might put Chase out of business. Oregon law, however, will not impose tort liability merely because a factfinder believes that a creditor should have abstained from pressing its legal rights against a delinquent debtor. Chase failed to prove that NWNG's letter caused the bank to revoke Chase's line of credit. Thus, there is no causal connection between the letter and any interference.

We conclude that the trial court erred in denying NWNG's motion for a directed verdict on Chase's intentional interference claim.[5] The Court of Appeals erred in affirming that ruling. Because the Court of Appeals held that the evidence permitted the jury to find that NWNG committed the tort of intentional interference with Chase's relationship with the bank, the court did not consider the issue presented

---

[5] Because Chase's tort claim fails for lack of proof on the element of causation, we specifically do not consider the merits of the Court of Appeals' discussion of improper means or improper purpose.

on appeal related to Chase's breach of contract claim. Accordingly, we reverse the decision of the Court of Appeals as to Chase's claim for intentional interference and remand this case to that court for consideration of the issue presented on appeal related to Chase's breach of contract claim. As to that issue, we express no opinion.

The decision of the Court of Appeals is reversed, and the case is remanded to the Court of Appeals for further proceedings.