HADLOCK, J.
*557 Plaintiffs, John Sanford (Sanford) and John M. Sanford, Inc. (Sanford, Inc.), contracted with defendant Risseeuw Logging, Inc. (Risseeuw) to cut timber on land owned by defendant Hampton Resources, Inc. (Hampton). Sanford sustained injuries when a piece of heavy equipment that he was operating fell off of a bridge on Hampton's land. Plaintiffs then brought this action against defendants, alleging claims for negligence, breach of contract, and intentional interference with economic relations (IIER),[1] as well as a claim for relief under Oregon's Employer Liability Law (ELL), ORS 654.305 to 654.336. The trial court granted summary judgment in favor of Hampton on plaintiffs' IIER and ELL claims. Then, after a trial, the jury returned a verdict in favor of defendants on plaintiffs' remaining claims and the trial court entered a general judgment consistent with that verdict. Plaintiffs appeal, raising five assignments of error. As explained below, we reject all of plaintiffs' assignments of error and, accordingly, we affirm the trial court's judgment.
The general background facts are undisputed. In August 2008, Hampton hired Risseeuw as a general contractor to harvest timber on a particular parcel of land owned by Hampton and known as the "Peregoy property." Risseeuw, in turn, hired Sanford, Inc., which was owned, operated, and managed by Sanford, as a subcontractor to harvest the timber using a piece of heavy equipment known as a feller buncher. When going to the site where he was to harvest timber, Sanford came to a bridge that crossed over a stream on the Peregoy property. The bridge was constructed of wood over the top of a railcar. Sandford attempted to drive the feller buncher over the bridge, but when he was midway *558 across, he and the feller buncher fell from the bridge into the stream below.
Plaintiffs later filed this action against defendants. The operative complaint (plaintiffs' second amended) included claims against Risseeuw and Hampton for negligence, breach of contract, and damages under the ELL, alleging that, as a result of the accident, Sanford had sustained serious personal injuries, emotional stress, and other damages. In particular, the complaint alleged that the bridge had collapsed when Sanford attempted to drive over it. In their claim for negligence, plaintiffs alleged that defendants were negligent in furnishing a defective bridge, failing to design and maintain an adequate bridge, and in representing that the bridge was adequate. Plaintiffs' claim for breach of contract alleged that defendants violated an "implicit" agreement to provide a "safe and adequate means of travel" to and from the job site. And, with respect to the ELL claim, plaintiffs alleged that defendants had a right to control the roads and bridges on the Peregoy property and that, in "failing to adequately design, inspect, maintain or otherwise improve the condition of the bridge in question," defendants "failed to use every device, care and precaution that was practicable for the protection and safety" of Sanford.
*1195 In addition to seeking damages for Sanford's injuries, plaintiffs' complaint included a claim against Hampton for IIER, alleging that, after the accident, Hampton had made disparaging statements regarding plaintiffs to third parties and had instructed Risseeuw and others not to work with plaintiffs.[2]
In May 2012, Risseeuw moved for summary judgment on the negligence, breach of contract, and ELL claims. Hampton joined in that motion and, in addition, moved for summary judgment on plaintiffs' IIER claim. After a hearing, the trial court granted summary judgment in favor of Hampton on plaintiffs' IIER claim, but denied summary judgment on the remaining claims. In February 2015, Risseeuw again sought summary judgment on plaintiffs' claims. Hampton again joined the motion for summary judgment. This time, after a hearing, the trial court entered *559 an order granting summary judgment as to the ELL claim against Hampton and with respect to one specification of negligence in the second amended complaint. It otherwise denied summary judgment.
Meanwhile, in April 2015, plaintiffs moved to file a third amended complaint. Defendants opposed the motion and, after hearing argument, the court granted the motion in part and denied it in part. In particular, the court permitted plaintiffs to amend their complaint to conform to the court's rulings to date and to include updated medical damages, but it did not allow plaintiffs to increase the amount of their claim for noneconomic damages or to add new theories of negligence. In August 2015, plaintiffs moved a second time for leave to amend the complaint and the court denied that motion. Eventually, in September 2015, the case went to trial and, ultimately, the jury returned a verdict in favor of defendants on all of plaintiffs' remaining claims. Based on the jury's verdict, the court later entered a general judgment in favor of defendants.
As noted, plaintiffs raise five assignments of error on appeal. In their first assignment, plaintiffs contend that the trial court erred in granting summary judgment in favor of Hampton on the IIER claim. In their second assignment, they assert that the court erred in granting summary judgment in favor of Hampton on the ELL claim. Plaintiffs next argue, in their third assignment of error, that the trial court erred in denying their April 2015 motion to amend the complaint. Finally, plaintiffs assign error to two of the court's trial-related rulings: In their fourth assignment, plaintiffs contend that the trial court erred in excluding particular evidence as outside the scope of the pleadings and, in their fifth assignment, they argue that the court erred in denying their mid-trial motion to conform the pleadings to the evidence pursuant to ORCP 23 B. We reject plaintiffs' fourth and fifth assignments of error without discussion, and address each of plaintiffs' remaining three assignments of error in turn.
We begin with plaintiffs' contention that the trial court erred in granting summary judgment in favor of Hampton on the IIER claim. As the Supreme Court has *560 explained, to succeed on an IIER claim, a plaintiff must show
"(1) the existence of a professional or business relationship (which could include, e.g., a contract or a prospective economic advantage), (2) intentional interference with that relationship, (3) by a third party, (4) accomplished through improper means or for an improper purpose, (5) a causal effect between the interference and damage to the economic relationship, and (6) damages."
McGanty v. Staudenraus , 321 Or. 532, 535, 901 P.2d 841 (1995).
Here, as relevant on appeal, plaintiffs had alleged that Hampton improperly interfered with their economic relations by improper means by instructing Risseeuw that, if plaintiffs did not pay for the collapsed bridge, plaintiffs could not be hired for any additional jobs involving Hampton projects or property and by instructing other contractors not to subcontract with plaintiffs for logging work on Hampton projects or property. In its *1196 motion for summary judgment on the IIER claim, Hampton asserted that plaintiffs could not establish that Hampton had intentionally interfered with any relationship or advantage of plaintiffs through improper means or for an improper purpose. Plaintiffs responded that the evidence created a question of fact on those issues. The trial court agreed with Hampton. According to the court, even when viewed in the light most favorable to plaintiffs, the record on summary judgment did not contain evidence that Hampton "intentionally interfered with plaintiffs' relationship with contractors, accomplished by Hampton through improper means or for an improper purpose." Accordingly, the court granted Hampton's motion for summary judgment.
In addition to the facts already recounted, the facts on summary judgment are as follows. For a number of years before the accident, plaintiffs did a significant amount of logging work for Risseeuw. In turn, the vast majority of Risseeuw's work came from Hampton. After the accident, Risseeuw did not hire plaintiffs again.
The parties presented deposition testimony regarding whether Hampton had intentionally interfered with *561 plaintiffs' economic relationships by causing Risseeuw and other logging companies not to hire Sanford or Sanford, Inc. following the accident. David Hampton, one of Hampton's principals, testified that Hampton never told its contractors not to hire plaintiffs. Vroman, a forester for Hampton, similarly said that he was not aware of anyone from Hampton telling contractors that Hampton did not want plaintiffs used on Hampton projects.
Ken Risseeuw, one of Risseeuw's principals, testified that no one from Hampton ever told him that he should not hire plaintiffs to work on Hampton projects and that the decision not to hire Sanford or Sanford, Inc. after the date of the accident was "[his] decision alone." According to David Risseeuw, the company's other principal, Risseeuw's decision to no longer hire plaintiffs after the accident was "a coincidence."
In a recorded conversation with Ken Risseeuw following the accident, Sanford told Ken that he had "heard a couple rumors and heard a couple things" and felt that he was "getting shoved under the bus a little bit by Hampton." After some general discussion about the bridges on the site, and who might be responsible for their condition, Sanford informed Ken that he had "heard that, you know, I either * * * take responsibility for the bridge and pay or I don't work for Hampton or [Risseeuw] anymore." Asked by Sanford if that was true, Ken responded that he was "basically * * * stuck in the middle." He further stated, "all I know is what, you know, what kind of, you know, pressure I'm getting, * * * and, you know, I'm not really getting much pressure other than the fact that, you know, how we want to handle the situation." But, Ken said, "I can read between the lines pretty easy." Asked again by Sanford about the rumors that he "either pay or [not] work for [Hampton]," Ken responded that that was "probably the gray area or the * * * unwritten sentence" but, according to Ken, it had "never been said."
Plaintiffs also presented evidence on summary judgment from Stone, who ran another logging company that had hired Sanford and Sanford, Inc. in the past. Stone's company received approximately 25 percent of its logging contracts from Hampton. Stone initially testified, "I think *562 [a Hampton representative] said not to use [plaintiffs] if I didn't have to or he wished [I] wouldn't." Stone followed up however, by asserting twice that the representative did not tell him not to use plaintiffs' services, and "the best [Stone could] come up with" was to explain that he had a "feeling" that Hampton would "just as soon [Stone] didn't use [Sanford]." After that conversation, Stone did not hire plaintiffs for any Hampton projects.
We will affirm a trial court's ruling granting a defendant's motion for summary judgment if there is no genuine issue of material fact and the defendant is entitled to judgment as a matter of law. ORCP 47 C. No genuine issue as to a material fact exists if, based on the record before the trial court, viewed in the light most favorable to the plaintiff, no objectively reasonable juror could return a verdict for the plaintiff on the matter that is the subject of the motion for summary judgment. Id . A plaintiff has the burden of producing evidence on any issue *1197 raised in the motion as to which the plaintiff would have the burden of persuasion at trial. Id .
In plaintiffs' view, the evidence viewed in the light most favorable to them was that, after the accident, "Hampton made it known to Risseeuw and at least one other logger that unless Sanford paid for the bridge and admitted fault, anyone who hired Sanford risked future contracts with Hampton." But the evidence here does not permit that conclusion. Instead, we agree with the trial court that, viewed in the light most favorable to plaintiffs, the evidence was insufficient to allow a juror to return a verdict in favor of plaintiffs on the IIER claim.
As noted, to establish IIER, plaintiffs must demonstrate, among other things, that Hampton intentionally interfered with economic relations or a prospective economic advantage, and that that intentional interference was accomplished through improper means or for an improper purpose. McGanty , 321 Or. at 535, 901 P.2d 841. The tort of intentional interference with economic relations "serves as a means from protecting contracting parties against interference in their contracts from outside parties." Id. at 536, 901 P.2d 841 (emphasis omitted). A claim "is made out when interference resulting *563 in injury to another is wrongful by some measure beyond the fact of the interference itself. Defendant's liability may arise from improper motives or from the use of improper means." Top Service Body Shop v. Allstate Ins. Co. , 283 Or. 201, 209, 582 P.2d 1365 (1978) ; see Straube v. Larson , 287 Or. 357, 361, 600 P.2d 371 (1979) (To prevail, a plaintiff must establish "not only * * * that defendant intentionally interfered with his business relationship but also that defendant had a duty of non-interference; i.e. , that [defendant] interfered for an improper purpose rather than for a legitimate one, or that defendant used improper means which resulted in injury to plaintiff. Therefore, a case is made out which entitles plaintiff to go to a jury only when interference resulting in injury to another is wrongful by some measure beyond the fact of the interference itself." (Internal quotation marks omitted.)).
Thus, interference in another party's contractual or other economic relations is tortious only if it is "wrongful by some measure beyond the fact of the interference itself." Northwest Natural Gas Co. v. Chase Gardens, Inc. , 328 Or. 487, 498, 982 P.2d 1117 (1999) (internal quotation marks omitted). That wrongfulness may take the form of the use of improper means, or the pursuit of an improper purpose. Id . "If liability is based on improper means, 'then the means must violate some objective, identifiable standard, such as a statute or other regulation, or a recognized rule of common law, or, perhaps, an established standard of a trade or profession.' " Sharma v. Providence Health & Services-Oregon , 289 Or. App. 644, 668, 412 P.3d 202, rev. den. , 363 Or. 283, 432 P.3d 1078 (2018) (quoting Northwest Natural Gas Co. , 328 Or. at 498, 982 P.2d 1117 ). "Examples of improper means include violence, threats or other intimidation, deceit or misrepresentation, bribery, unfounded litigation, defamation, or disparaging falsehood." Grimstad v. Knudsen , 283 Or. App. 28, 57, 386 P.3d 649 (2016), rev. den. , 361 Or. 350, 393 P.3d 1181 (2017) (internal quotation marks omitted). And if liability "is to be based on [the defendant's] purpose, then the purpose must be to inflict injury on the plaintiff as such." Northwest Natural Gas Co. , 328 Or. at 498, 982 P.2d 1117 (internal quotation marks omitted); see also Top Service Body Shop , 283 Or. at 212, 582 P.2d 1365 (evidence of acts that were "wholly consistent" with the defendant's "pursuit of its own business purposes as it saw them" did "not suffice *564 to support an inference of the alleged improper purpose to injure" the plaintiff).
Here, the evidence on summary judgment was not sufficient to create an issue of fact regarding IIER. Although there was evidence that plaintiffs had worked with Risseeuw and with Stone's company over the years, but were not hired after the accident, there was no evidence of intentional interference by Hampton. That is, there was no testimony that Hampton directly instructed its contractors that it did not want plaintiffs working on Hampton projects, or that future contracts with Hampton were at risk for contractors who hired plaintiffs. Stone did initially testify that he thought that a Hampton *1198 representative had said not to use plaintiffs if Stone "didn't have to" or suggested that the representative wished that Stone would not do so. However, Stone immediately clarified that the representative had not told him not to use plaintiffs' services, but had only given Stone a "feeling" about Hampton's preference. When that deposition testimony is considered as a whole, even viewing it in the light most favorable to plaintiffs, such evidence of a "feeling" about what Hampton wanted is insufficient to create an issue of fact regarding whether Hampton intentionally interfered. Similarly, the recorded telephone call between Ken Risseeuw and Sanford, which plaintiffs point to as evidence "sufficient to defeat summary judgment," reflected only that Ken had an impression regarding Hampton's wishes based on Ken's reading "between the lines" to intuit Hampton's position, even though it had "never been said." However, the content of the telephone call, which included Ken's statement that he was "not really getting much pressure," does not create an issue of fact on summary judgment with respect to intentional interference. Although the record on summary judgment might support an inference that certain individuals believed that Hampton did not want them to work with plaintiffs, there are no facts regarding acts or statements-that is, actual interference-from Hampton that would support those beliefs. See Miller v. State of Oregon , 298 Or. App. 70, 93-96, 445 P.3d 371 (2019) (plaintiff's "strong impression" that employer treated her differently based on her gender was insufficient to support a discrimination claim); *565 Deberry v. Summers , 255 Or. App. 152, 167, 296 P.3d 610 (2013) (explaining that, "[a]lthough the line between reasonable inference and impermissible speculation is not always easy to draw, in certain respects, the line is a bright one," and concluding that, on summary judgment, one person's belief about another's intent was insufficient to "permit a trier of fact to engage in any deductive process other than pure speculation"). Instead, viewing the record on summary judgment in the light most favorable to plaintiffs, there was not evidence from which a jury could conclude that Hampton intentionally interfered with a prospective economic advantage of plaintiffs.
Moreover, even if the evidence would have allowed a jury to find that Hampton implicitly communicated a desire that Risseeuw or Stone not work with plaintiffs on Hampton projects, the record would not support a determination that Hampton did so for an improper purpose or by improper means, as plaintiffs argue. Plaintiffs essentially contend that Hampton's conduct was improper for three reasons. First, they assert that the evidence was sufficient to support a finding that Hampton communicated to Risseeuw and Stone that "anyone who hired Sanford risked future contracts with Hampton." We disagree. Even if the evidence discussed above was sufficient to create a genuine dispute of fact about whether Hampton communicated a desire that contractors not subcontract with plaintiffs, there is no evidence that would support a finding that Hampton threatened to cut off relationships with those contractors if they did so. Cf. Uptown Heights Associates v. Seafirst Corp. , 320 Or. 638, 654, 891 P.2d 639 (1995) (for a defendant to be liable under this kind of IIER theory, the defendant "must have used its own refusal to deal [with an entity in the same position as the contractors in this case] as a form of 'affirmative inducement, compulsion or pressure' to make [the entity] break its contract with" the plaintiff).
Second, plaintiffs point to "the hierarchical structure of the logging industry" and evidence that Hampton was a powerful company that could put significant economic pressure on the individuals and entities with whom it contracted. That argument does not, however, establish a basis for tort liability because it does not establish that Hampton's economic power gave it "a duty of non-interference," as required *566 to establish improper means or purpose. Northwest Natural Gas Co. , 328 Or. at 498, 982 P.2d 1117 (internal quotation marks omitted). That is, plaintiffs have not explained how the record or the law would support a determination that Hampton's economic power was, by itself, something that made its conduct "wrongful by some measure beyond the fact of the interference itself." Id . (internal quotation *1199 marks omitted); cf . Eusterman v. Northwest Permanente, P.C. , 204 Or. App. 224, 238, 129 P.3d 213, rev. den. , 341 Or. 579, 146 P.3d 884 (2006) (it is not improper for a company to act to maximize its profits, nor is it improper for a company to interfere with another's economic relations "in a manner 'wholly consistent with [the company's] pursuit of its own business purposes' "; (quoting Top Service Body Shop , 283 Or. at 212, 582 P.2d 1365 )).
Third, plaintiffs point to a deposition statement by David Hampton that they characterize as an admission that Hampton would be exerting "improper" control and interference over general contractors if it told them which subcontractors to hire (which he denied that Hampton had done). Plaintiffs argue that David Hampton's statement is sufficient to create a genuine dispute of fact regarding whether "Hampton's control over its contractor's selection and use of subcontractors was contrary to industry standard," implicitly relying on statements in the case law that "perhaps" improper means can be established through evidence of violation of "an established standard of a trade or profession." Top Service Body Shop , 283 Or. at 209, 582 P.2d 1365.
Indeed, David Hampton did state, after denying that Hampton told its contractors which subcontractors to hire, that he thought such conduct would be improper:
"Q. * * * Well, you've just told me it's up to the total discretion of a contractor such as Risseeuw Logging, Incorporated, on who they want to hire as subcontractors, is that correct?
"[Hampton]: Correct.
"Q. Okay. And so, sir, based upon Hampton's procedures that it follows, would it be improper for Hampton then to tell a contractor such as Risseeuw Logging, Incorporated who it could hire to perform work on a project?
"[Attorney]: Object to the form of the question. * * *
*567 "[Hampton]: We do not tell the contractor who to hire.
"Q. * * * Ever?
"[Hampton]: Ever.
"Q. And so it's always remained the total discretion of that contractor on who they want to hire, am I correct?
"[Hampton]: That's correct.
"Q. Okay. And is that true today as well?
"[Hampton]: Yes.
"Q. And has Hampton Resources, Incorporated ever told any contractors that it's hired not to hire [either plaintiff]?
"[Hampton]: No.
"Q. I am correct that that has never occurred?
"[Hampton]: That's never occurred.
"Q. All right. Do you think that would be improper to do that?
"[Hampton]: Yes.
"Q. And why would that be improper?
"[Hampton]: That's not our job."
The difficulty with plaintiffs' reliance on that deposition testimony is that it bears no relation to any established industry standard. No reasonable factfinder could infer from the quoted testimony that David Hampton was referring to an established standard of the logging industry rather than to his personal, professional opinion about what practices would be improper for his own company to engage in. Accordingly, that evidence, too, was insufficient to defeat Hampton's motion for summary judgment on the IIER claim.[3]
*1200 *568 In sum, none of the arguments that plaintiffs present in conjunction with their first assignment of error establish that the trial court erred in granting summary judgment in favor of defendants on that claim.
In their second assignment of error, plaintiffs assert that the trial court erred in granting summary judgment in favor of Hampton on plaintiffs' ELL claim.[4] "Oregon's ELL imposes liability on 'all owners, contractors or subcontractors and other persons having charge of, or responsibility for' work involving a risk or danger." Yeatts v. Polygon Northwest Co. , 360 Or. 170, 179, 379 P.3d 445 (2016) (quoting ORS 654.305 ).[5] In addition to a worker's direct employer, ELL liability may be imposed on an indirect employer
"who (1) is engaged with the plaintiff's direct employer in a common enterprise; (2) retains the right to control the manner or method in which the risk-producing activity was performed; or (3) actually controls the manner or method in which the risk-producing activity is performed."
Woodbury v. CH2M Hill, Inc. , 335 Or. 154, 160, 61 P.3d 918 (2003) (internal quotation marks and footnote omitted). Thus, a defendant may be liable under the ELL as an indirect *569 employer if that defendant retained the right to control the manner or method in which the risk-producing activity was performed.
It was undisputed on summary judgment that Hampton designed and built the bridge in question. Furthermore, the type of railcar bridges that Hampton installed on the Peregoy property were standard in the logging industry. The written contract between Hampton and Risseeuw provided Risseeuw with a nonexclusive right to use the roads on the Peregoy property; at the time of the accident, both Hampton and Risseeuw had the right to control the roads and bridges on the property.[6]
Defendants submitted testimony from Sanford stating that, within Sanford, Inc., he was the one responsible for making sure there was a safe workplace for employees. They also presented evidence that, if an operator believed a bridge was too narrow to safely cross with his or her equipment, a common practice was to make a request for a "temporary crossing" in which equipment could be taken directly across a stream without using a bridge and, at the time of the accident, it was a favorable time to obtain such a temporary crossing.
However, prior to plaintiffs starting the job, Sanford and Ken Risseeuw discussed how Sanford could get his equipment onto the logging site. Furthermore, David Risseeuw, who described himself as the "supervisor" of the Peregoy site, specifically instructed Sanford to cross the bridge. Sanford testified as follows:
"Q. All right, where was it that you planned to take that feller buncher that morning?
"A. Uhm, across that bridge and cut timber on the right.
"Q. But this was a bridge you hadn't seen before?
*1201 "A. Right.
*570 "Q. Why did you decide you were going to take it up there?
"A. Because Dave Risseeuw told me to.
"Q. When?
"A. The night before-or, excuse me, on the 25th when we talked about starting the unit.
"Q. What did Dave Risseeuw tell you exactly?
"A. He told me that he wanted me to go up across that bridge and start cutting the timber on the right side of the road between the buffer and the road."
With respect to plaintiffs' ELL claim, defendants asserted on summary judgment that the proper "inquiry is whether the [alleged] indirect employer had the right to control the specific risk-producing activity, in this case Mr. Sanford's decision to cross a narrow bridge with his heavy equipment." Defendants argued that the "bridge itself cannot be a 'risk-producing activity' as the only activity was Mr. Sanford's decision to drive across that bridge with his feller buncher." (Emphasis in original.) According to defendants, plaintiffs "retained full control" of that risk-producing activity.
With respect to Hampton, plaintiffs asserted that the court should not grant summary judgment because Hampton had "exercis[ed] control over the instrumentality, which casts a shadow of risk on [Sanford], which makes [Hampton] responsible." In other words, plaintiffs asserted that Hampton was responsible under the ELL because it controlled the bridge itself.
As noted, on the ELL claim, the trial court granted summary judgment in favor of Hampton but denied summary judgment as to Risseeuw. The court explained that "clearly under the [ELL], an employee can sue an indirect employer, they can sue somebody that is not directly their employer. So as an employee of his corporation [Sanford, Inc.,] Mr. Sanford individually can potentially under the ELL sue somebody who is his indirect employer." With respect to Risseeuw, the court concluded that there was a "triable issue of material fact" on the ELL claim because "you have the plaintiff testifying, 'Dave Risseeuw told me *571 to cross that bridge.' That, if believed by the jury, is direct control over the instrumentality and the way in which the plaintiff was injured." The court reached a different conclusion with respect to Hampton:
"With regard to Hampton, though, that is more problematic for me. I'm having trouble seeing that Hampton is * * * an indirect employer of Sanford. True, Hampton is ultimately, you know, the party whose logs are getting cut, but they've contracted with Risseeuw to do that. Risseeuw is who brought in Sanford. The only evidence of somebody telling Mr. Sanford to use this bridge or that all the roads are good to go is that that was Risseeuw. You know, there may be an issue with regard to Hampton as far as it being the owner of the property or having built the bridge, but that's not an issue in the Employer Liability Law claim[.]"
On appeal, plaintiffs contend that the trial court erred in "failing to find that Hampton was an indirect employer given its ownership of and control over the design, installation, placement and maintenance of the bridge." (Boldface and uppercase omitted.) They assert that there was evidence on summary judgment that Hampton retained the right to control the risk-producing activity and, therefore, could be held liable as an indirect employer under the ELL. In particular, plaintiffs argue that the trial court erred in identifying the risk-producing activity; in plaintiffs' view, the "correct focus should have been on the * * * workplace environment and its safety or lack thereof." In plaintiffs' view, the "raised travel surface created by [the] bridge substantially increased the risk of danger to employees and was the risk-producing activity that the [trial court] should have used for its analysis." (Emphasis added.) According to plaintiff, Hampton designed, built, and had a right to control the bridge and, therefore, is liable as an indirect employer.
Defendants respond that, in this case, the risk-producing activity was "driving the feller-buncher across the bridge" and, they assert, there is no evidence that Hampton had any control over that activity. Instead, defendants *1202 point out, the only evidence with respect to that activity is that Risseeuw directed plaintiffs to cross the bridge. Thus, defendants assert that the trial court correctly concluded *572 that Hampton was not an indirect employer for purposes of the ELL. As explained below, we agree with defendants.
As noted, a defendant may be liable as an indirect employer under the ELL if the defendant "retained the right to control the manner or method in which the risk-producing activity was performed." Woodbury , 335 Or. at 160, 61 P.3d 918 ; see ORS 654.305 (imposing heightened standard of care of a person or entity "having charge of, or responsibility for, any work involving a risk or danger"). Thus, we must initially identify the work involving risk or danger over which Hampton must have retained a right of control. The Supreme Court has defined the relevant scope of the work involving risk or danger to include both the worker's discrete task and the circumstances under which the worker must perform that task. See Woodbury , 335 Or. at 161, 61 P.3d 918.
For example, in Woodbury , the defendant (a contractor) had instructed the plaintiff's employer (a subcontractor) to install a pipe as part of a construction project. 335 Or. at 157, 61 P.3d 918. Much of the pipe was installed underground, and several feet had to be installed over a sunken stairway and corridor that was approximately 10 feet below ground level. The plaintiff's employer constructed a plywood platform to facilitate the installation of that section of pipe and, after the installation work was complete, the plaintiff began to dismantle the platform. While doing so, the plaintiff lost his balance and fell onto the corridor below. Id. at 158, 61 P.3d 918. Under those circumstances, the Supreme Court explained that the " 'work involving a risk or danger' included requiring plaintiff to work at height during the assembly, use, and disassembly of the platform." Id . at 162, 61 P.3d 918.
In Yeatts , a general contractor subcontracted with the plaintiff's employer to perform framing work on a residential development. 360 Or. at 173, 379 P.3d 445. The plaintiff's employer decided to use guardrails and constructed them as a fall protection system at the work site. While framing an exterior wall on the third floor of one of the residences, the plaintiff, who was kneeling down facing a guardrail, leaned against the guardrail in an attempt to push himself into a standing position. Id. at 177, 379 P.3d 445. The guardrail gave way and the plaintiff fell "19 feet to the concrete surface below." Id. In that case, the Supreme Court determined that the risk-producing *573 activity was correctly identified as "plaintiff's framing work at a dangerous height above a concrete surface." Id. at 179, 379 P.3d 445 (internal quotation marks omitted).
Here, considering both plaintiff's discrete task and the circumstances under which plaintiff was required to perform that task, the work involving risk or danger-that is, the risk-producing activity-was driving heavy equipment to the logging site across the railcar bridge. Thus, contrary to plaintiff's contention, the trial court was correct when it identified plaintiff's travel across the bridge-not the bridge itself-as the risk-producing activity.
Having identified the risk-producing activity for purposes of ELL liability, we turn to the question whether there was evidence on summary judgment that Hampton retained a right to control that activity.[7] "To establish that [Hampton] 'retained the right to control' the pertinent risk-producing activity, plaintiff[s] must 'identify some source of legal authority for that perceived right' or present evidence from which a retained right to control can be inferred." Id. at 184, 379 P.3d 445. Plaintiffs failed to do so here.
*1203 As discussed above, plaintiffs' theory of liability with respect to Hampton was that Hampton designed, built, and had a right to control the bridge itself. Before the trial court and on appeal, their arguments and evidence centered around that theory. Thus, plaintiffs argued to the trial court that Hampton was liable as an indirect employer because it exercised control over the bridge, and, on appeal, they again argue that Hampton was liable because it "not only had a right to control the bridge, [it] designed and built the bridge." As the trial court recognized, plaintiffs presented some evidence on summary judgment relating to Risseeuw's right to control the risk-producing activity-for example, as *574 described, there was evidence that Dave Risseeuw instructed Sanford to cross the bridge in order to reach the logging site. However, plaintiffs presented no evidence, on summary judgment, that Hampton had a right to control (either legal authority for a right by Hampton to control or evidence from which a right to control by Hampton could be inferred) the risk-producing activity as properly characterized (the work of driving heavy equipment to the logging site across the bridge). Accordingly, the trial court did not err in granting summary judgment with respect to Hampton on plaintiffs' ELL claim.
Finally, in their third assignment of error, plaintiffs assert that the trial court erred in denying their first motion for leave to amend pursuant to ORCP 23 A. As described above, in April 2015, plaintiffs moved to file a third amended complaint. At the time the motion to amend was filed, the trial was scheduled to begin in May 2015.[8] Among other things, the proposed third amended complaint would have more than doubled the amount of damages sought by plaintiffs, including increasing plaintiffs' alleged future medical damages from $10,000 to $1,587,123 and their noneconomic damages from $750,000 to $3,950,000. The proposed amendment would also have added a new specification of negligence. Where the second amended complaint alleged that the bridge had "collapse[d]" when Sanford was driving the feller buncher across it, the new complaint also alleged that the bridge failed after it "failed to remain balanced" while Sanford drove across. The proposed third amended complaint would have added new allegations that defendants were negligent
"[i]n failing to inspect and test the bridge after it sat for seven years, to discover the impact that a lack of a concrete or rock abutment would have when the bridge was loaded with a price of heavy and unequally weighted logging equipment including a feller-buncher or yarder that defendants knew would be using the bridge to access the Peregoy property;"
and
*575 "[i]n failing to warn the plaintiffs that the bridge was unsafe or subject to tipping or collapse when weighted with heavy logging equipment."
Plaintiffs also sought to allege that the accident and plaintiffs' injuries and damages were caused by defendants' negligence and recklessness "indicating a reckless and outrageous indifference to a highly unreasonable risk of harm, and [defendants'] conscious indifference to the health, safety and welfare of others."
Defendant opposed the proposed amendments, pointing out that the case had been pending for approximately five years and that the new allegations relating to negligence that plaintiffs sought to add were "the type of thing that * * * requires expert analysis." They observed that they had relied on the pleadings when preparing the case over the years it had been pending, including when deposing witnesses and conducting site visits. Discovery was closed at that point and, according to defendants, the insertion of such an issue at "this late juncture" would be "highly prejudicial."
The trial court ruled that it would not permit all of the amendments that plaintiffs had requested. It explained:
"I certainly understand that the-I mean, the rule expressly says that leave to amend shall be freely given when justice so requires *1204 and I think our court system certainly makes every opportunity to let parties try their case in the way that it needs to be tried.
"That being said, this case is five years old. I don't know how many times it's been set for trial. I know it was set for trial at least once before the trial that we were set for here. Counsel requested to bump the trial date, given that there were potential conflicts with in-custody cases, and I understand that, but, you know, it's been set at least twice for trial, it's five years old, and it's time to get this case done.
"And my overriding concern is that if we open up a lot of new windows, then to be fair, you have to reopen discovery. What I've said is we're not postponing the trial, we're not reopening the motion deadlines, we're not reopening discovery. If I'm going to allow new claims and new theories and significantly greater damages, then I can't do that without allowing discovery be reopened and allowing some *576 further opportunity for motions; that would not be fair. And then we're not going to get that trial date in September done either, and then who knows when Plaintiff is going to decide to hire yet another law firm that's going to hire another expert to come up with a different theory?
"I mean, at some point it has to stop, and it was, for whatever reason, the plaintiff's choice to chew through three different lawyers or three different law firms, each of whom had their own ideas about how things ought to be done or who needed to be talked to or what experts to consult.
"So with regard to the negligence allegations, I'm not going to allow any of those amendments. I think most of the requested amendments are unnecessary because they just simply restate things that are already in the allegations of negligence. To the extent that they're purporting to address something new, some new allegation of negligence, I agree with the Defense that it would be unfairly prejudicial to do that at this stage of the litigation, again unless I were going to reopen discovery and reopen motion deadlines, and I'm just not willing to do that in a five-year old case. And he's not only been through three lawyers, he's been through three judges, at least two trial settings. You know, this case needs to get done."
The court did not allow plaintiffs to amend the complaint to allege any new specification of negligence or to increase the noneconomic damages as requested. The court did, however, permit plaintiffs to amend the complaint to remove the IIER and ELL claims that had been disposed of on summary judgment, and to amend their past economic damages to match the medical bills and their future economic damages "with respect to future medical care only to the extent that such amendments are reasonably supported by the medical records received to date by Defendants regarding Mr. Sanford's anticipated future medical care allegedly related to the accident."
Pursuant to ORCP 23 A, after a responsive pleading has been served in a case, a plaintiff may amend the complaint "only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires." We review a trial court's ruling on a motion to *577 amend for abuse of discretion. Alexander v. State of Oregon , 283 Or. App. 582, 590, 390 P.3d 1109 (2017). "In applying that standard, we uphold the trial court's decision unless it exercises its discretion in a manner that is unjustified by, and clearly against, reason and evidence." Id. In evaluating the court's exercise of its discretion, we consider "(1) the proposed amendment's nature and its relationship to the existing pleadings; (2) the prejudice, if any, to the opposing party; (3) the timing of the proposed amendment; and (4) the colorable merit of the proposed amendment." Id.
Here, as the court's explanation of its decision demonstrates, the court appropriately exercised its discretion to deny the motion to amend. First, as the court recognized, certain of the proposed amendments would have substantially altered the case. In particular, plaintiff sought to substantially increase the amount of damages sought and to add new specifications of negligence. See *1205 Cutsforth v. Kinzua Corp. , 267 Or. 423, 433-34, 517 P.2d 640 (1973) (courts have discretion to allow amendments, provided the proposed amendment does not "substantially change the cause of action or inject an entire new element of damage"). Second, as the court concluded, allowing those amendments would be unfairly prejudicial to defendants under the circumstances. Discovery in the case was closed and, as defendants pointed out, they had prepared their case and conducted discovery based on the allegations in the second amended complaint. However, if the amendments were allowed, defendants plausibly asserted they would need to conduct additional discovery, including a new factual investigation involving "all of the individuals who were there onsite in the immediate proximity after the incident," and an "expert analysis" of the new allegations. And, because the case had been pending for nearly five years and, in light of the impending trial date, which had been reset more than once, the court was unwilling to reopen discovery (and other deadlines).[9] Thus, *578 the prejudice to defendants and the timing of the motion weighed in favor of the court's decision not to allow the amendment. In light of all of those considerations and the court's explanation of its reasoning, we cannot say that the court exercised its discretion in a manner that was unjustified by, and clearly against, reason and evidence. In light of the foregoing, we reject plaintiffs' third assignment of error.
Affirmed.

Both below and in their briefing on appeal, plaintiffs refer to their intentional interference claim as one for "intentional interference with economic opportunities." As we have observed, the "Supreme Court refers to this tort as both 'intentional interference with economic relations,' see, e.g. , McGanty v. Staudenraus , 321 Or. 532, 535, 901 P.2d 841 (1995), and, where applicable, 'intentional interference with prospective economic advantage,' see, e.g. , Allen v. Hall , 328 Or. 276, 281, 974 P.2d 199 (1999)." Fox v. Country Mutual Ins. Co. , 169 Or. App. 54, 69 n. 7, 7 P.3d 677 (2000), rev. den. , 332 Or. 137, 27 P.3d 1043 (2001). Throughout this opinion, we refer to the claim as one for intentional interference with economic relations or IIER.

Plaintiffs initially filed the IIER claim against both Risseeuw and Hampton. The trial court dismissed with prejudice the IIER claim against Risseeuw and that ruling is not at issue on appeal.

We note that, as defendants point out on appeal, the contract between Hampton and Risseeuw-on which all parties relied in the summary-judgment proceeding-includes a provision stating that Hampton had the right to, in its "sole discretion" disapprove any subcontracting of work by Risseeuw to others. As defendants further point out, a complaint generally cannot state an IIER claim when it shows that the defendant did precisely what the party was entitled to do under the contract. However, defendants acknowledge that they did not rely on that contractual provision in their summary judgment motion. Because it is not entirely clear to us that the record would not have developed differently had defendants made that argument below, we decline to affirm the granting of summary judgment on that newly raised basis. Cf. Fenimore v. Blachly-Lane County C.E.A. , 297 Or. App. 47, 61, 441 P.3d 699 (2019) (affirming summary judgment on basis not raised in the trial court because, had the issue been raised below, the nonmoving party "could not have developed a different record" on that point).

Plaintiffs also raise a procedural argument with respect to their second assignment of error. They contend that the trial court should have "given deference" to the earlier ruling denying summary judgment on the ELL claim. Defendants respond, in part, that plaintiffs failed to preserve the error, and, perhaps, even invited it before the trial court. See ORAP 5.45(1) ("No matter claimed as error will be considered on appeal unless the claim of error was preserved in the lower court and is assigned as error in the opening brief[.]"). We agree that plaintiffs failed to preserve their procedural contention with respect to the second assignment of error and, accordingly, do not consider it further.

ORS 654.305 provides:
"Generally, all owners, contractors or subcontractors and other persons having charge of, or responsibility for, any work involving a risk or danger to the employees or the public shall use every device, care and precaution that is practicable to use for the protection and safety of life and limb, limited only by the necessity for preserving the efficiency of the structure, machine or other apparatus or device, and without regard to the cost of suitable material or safety appliance and devices."

On summary judgment, plaintiffs referenced Hampton's answer in which it admitted that both it and Risseeuw had the right to control the roads and bridges. Plaintiffs also submitted evidence that, in the middle of a logging contract, the logger (here, Risseeuw) was generally responsible for the bridges.

To the extent that plaintiffs contend there is sufficient evidence to create a triable issue of fact as to whether Hampton was liable under the ELL because it actually controlled the manner or method in which the risk-producing activity was performed, we are not persuaded. "Liability under the actual control test is triggered only if the defendant actually controls the manner and method-that is, how-the plaintiff or the plaintiff's employer performs the risk-producing activity." Yeatts , 360 Or. at 183 n. 3, 379 P.3d 445. The record here does not disclose any kind of active participation by Hampton that would give rise to a jury issue regarding whether Hampton actually controlled the risk-producing activity.

At plaintiffs' request, for reasons unrelated to the motion to amend, the court rescheduled the trial to September 2015.

We further note that, at the time it ruled on the first motion to amend, the court had been advised that one witness had suffered "cognitive decline" and would be unable to testify at trial. The court made mention of that consideration when it again declined to permit plaintiffs to make their requested amendments in August 2015, stating that the "incident dates back to 2008" and that there was "at least one witness" who had "become unavailable due to cognitive decline since the date that the incident happened."